UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


| UNITED STATES OF AMERICA, | ) | CASE NO: 1:21-MJ-00123-SCY |
|---|---|---|
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| RYAN L. HARRIS, | ) | Wednesday, February 3, 2021 |
| | ) | |
| Defendant. | ) | (11:06 a.m. to 12:05 p.m.) |


PRELIMINARY EXAMINATION / DETENTION HEARING

BEFORE THE HONORABLE KIRTAN KHALSA,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:              LETITIA SIMMS, ESQ.
                           U.S. Attorney's Office
                           201 3rd Street NW
                           Suite 900
                           Albuquerque, NM 87102

For Defendant:             JACK (HAKOP) J. MKHITARIAN, ESQ.
                           1008 5th Street NW
                           Albuquerque, NM 87102

U.S. Pretrial/Probation: M. Pirkovic

Court Reporter:            Recorded; Liberty: ABQ-ZOOM

Clerk:                     E. Hernandez

Transcribed By:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

## INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KASEY RAMOS | 4 | 24 | 29 | 32 |

ARGUMENT

| | | | | |
|---|---|---|---|---|
| RE PROBABLE CAUSE | 33 | | | |
| RE DETENTION | | | | |
|   BY MS. SIMMS | 34 | | | |
|   BY MR. MKHITARIAN | 37 | | | |

RULING

| | |
|---|---|
| RE PROBABLE CAUSE | 33 |
| RE DETENTION | 37 |

1    **Albuquerque, NM; Wednesday, February 3, 2021; 11:06 a.m.**

2        **(Appearances via Zoom web video conferencing)**

3                    **(Call to Order)**

4        **THE COURT:**  All right.  We're on the record in United

5    States of America versus Ryan Harris.

6        Please enter your appearances.

7        **(Extraneous voices heard)**

8        **THE COURT:**  I hear somebody.  Hold on, I'm sorry.

9        I hear somebody on here who's giggling and talking.

10   So I don't know who it is -- okay, it's gone away so it may

11   have been the agent.

12       Please enter your appearances.

13       **MS. SIMMS:**  Letitia Simms on behalf of the United

14   States.

15       **MR. MKHITARIAN:**  And good morning, Your Honor.  Jack

16   Mkhitarian on behalf of Mr. Harris who appears --

17       I can't see him on the -- there he is.

18       -- appears by Zoom meeting today.  I did send over a

19   filed Waiver of Personal Presence at Hearing for the Court's

20   consideration.

21       **THE COURT:**  Good morning to both of you, Counsel.

22       And Mr. Harris, good morning to you.

23       **THE DEFENDANT:**  Good morning.

24       **THE COURT:**  Can you tell me your name, sir?

25       **THE DEFENDANT:**  Ryan Harris.

1          **THE COURT:**  Okay.  Mr. Harris, I have in front of me

2     a Waiver of Personal Presence at today's preliminary hearing

3     and detention hearing.  Did you sign this document freely and

4     voluntarily after discussing it with your attorney and reading

5     it?

6          **THE DEFENDANT:**  Yes, ma'am.

7          **THE COURT:**  And do you consent to proceed this

8     morning by video?

9          **THE DEFENDANT:**  Yes, ma'am.

10          **THE COURT:**  Okay.  All right.  We will first move

11     into the preliminary hearing and the government can call its

12     witness.

13          **MS. SIMMS:**  The United States calls Detective Kasey

14     Ramos (phonetic).

15          **THE CLERK:**  Please raise your right hand, sir.

16          **KASEY RAMOS, GOVERNMENT'S WITNESS, SWORN**

17          **THE COURT:**  Proceed.

18          **MS. SIMMS:**  Okay.  Thank you, Judge.

19                   **DIRECT EXAMINATION**

20     **BY MS. SIMMS:**

21     Q    Detective Ramos, have you in recent months have an

22     opportunity to investigate Mr. Ryan Harris?

23     A    I have.

24     Q    Do you see him on the Zoom video in one of these screens?

25     A    I do.  He's wearing the tan jumpsuit.  The shirt has a

1  V-neck.  There's a little bit of a tattoo sticking out and he

2  has a white mask on.

3  Q    At some point did you become aware of an incident that

4  Mr. Harris had in March of 2020?

5  A    I did.

6  Q    Okay.  And that was with -- that incident was investigated

7  by APD; is that right?

8  A    That's correct.

9  Q    Now, on the complaint it says, "On or about March 23rd,

10 2020".  After a bit more verification, do you have another date

11 that you believe that this incident occurred on?

12 A    I do.  The original police report and criminal complaint

13 said the 23rd; however, when I was able to dial into it more, I

14 found out it was the 26th and not the 23rd.

15 Q    And did you review lapel video in this matter?

16 A    I did.

17 Q    And does that APD lapel video indicate March 26th, 2020?

18 A    It does.

19 Q    Okay.

20        **MS. SIMMS:**  And Judge, at this time I would argue

21 that it's on or about March 23rd.  We can certainly file an

22 amended complaint if the Court would want.  But we did catch

23 that before the hearing and I wanted to clear it up.  (Glitch

24 in audio) -- like us to file an amended complaint, we can do

25 that but I can proceed with the probable cause portion of this

1   hearing if you like.

2           **THE COURT:**  Any objection to an amendment by

3   interlineation here in court?

4           **MR. MKHITARIAN:**  No objection, Your Honor.

5           **THE COURT:**  All right.  The complaint will be amended

6   by interlineation to reflect on or about the date of March

7   26th.

8           **THE DEFENDANT:**  Now, that's great.

9           **THE COURT:**  Mr. Harris, the reality is that the

10  criminal complaint charged on or about the date of March 23rd.

11  The government has clarified that with the witness' testimony

12  here.

13          And Ms. Simms, are you moving by interlineation to

14  correct the date?

15          **MS. SIMMS:**  I am moving to amend the date by

16  interlineation.  Thank you, Your Honor.

17          **THE COURT:**  Okay.  And there being no objection, the

18  Court grants the motion.  But frankly, Mr. Harris, the Court

19  would have granted it anyway --

20          **THE DEFENDANT:**  Okay.

21          **THE COURT:**  -- over objection.  So --

22          **THE DEFENDANT:**  Okay.

23          **THE COURT:**  -- I've heard sworn testimony regarding

24  the date.

25          All right.  Let's continue.

1    **BY MS. SIMMS:**

2    Q    Okay.  Now, after reviewing the events of March 26th, did

3    you file a complaint in this matter?

4    A    I did.

5    Q    And was that approved by a United States Magistrate?

6    A    Yes, it was.

7    Q    Okay.  And on March 26th of 2020, can you describe how

8    Albuquerque Police came in contact with Mr. Harris?

9    A    Absolutely.  The auto theft unit with APD was doing patrol

10   on the 300 block of Texas Street Southeast -- and which is

11   roughly Pennsylvania and Central within the city of Albuquerque

12   -- when they observed a 2020 Audi Q3 dark in color vehicle.

13          There was a license plate displayed on the vehicle.

14   They checked that license plate through MVD/NCIC and learned

15   that the vehicle was stolen or reported as stolen.

16          **THE DEFENDANT:**  Yeah, you're right.

17   Q    So upon viewing what they believed to be a stolen vehicle,

18   what did detectives with APD do?

19   A    They conducted covert surveillance.  They followed the

20   vehicle covertly to the Motel 6 which is at 8510 Pan American

21   Freeway still in the city of Albuquerque.

22   Q    And what did they observe?

23   A    The vehicle pulled into the parking lot and a male driver

24   who was identified later as Mr. Ryan Harris exited the vehicle

25   along with two females.  They walked into the Motel 6 lobby.

1          A short time later Mr. Harris exited the hotel and

2   walked back towards the driver's seat.  The detective noted

3   that he had a set of keys in his hand.  And as he approached

4   the vehicle in question, the lights flashed -- which is typical

5   when a vehicle is being unlocked.

6   Q    And what happened next?

7   A    They challenged Mr. Harris.  They identified themselves as

8   police officers at which point Mr. Harrison -- excuse me --

9   Mr. Harris refused to listen and ran to the south side of the

10  Motel 6 and he ran south and east.

11  Q    Okay.  And what did police do when Mr. Harris ran from

12  them?

13  A    Some of them gave chase on foot; some of them gave chase

14  in a vehicle.  One of the detectives was following Mr. Harris

15  in his vehicle at which point he observed Mr. Harris throw

16  something over a fence into an adjacent sort of neighborhood.

17  I watched lapel video and as the chase is going on the

18  detective remarks on video saying, "He just threw something

19  over the fence."

20  Q    And when you watched the lapel video, can you see the

21  fence that is being referenced when the detective says, "He

22  just threw something over the fence"?

23  A    At the time he says that, no, but it is visible after

24  Mr. Harris is taken into custody, I could see it.

25  Q    Okay.  Do you recall how long from when you heard the

1  detective say, "He just threw something over the fence," did

2  they have Mr. Harris in custody?

3  A    Almost immediately after Mr. Harris threw that item, he

4  laid on the floor and surrendered.  And there was probably a

5  30-second time delay where they waited for other detectives to

6  come up and then took Mr. Harris into custody.

7  Q    Did you hear on the lapel video an exchange between this

8  detective and Mr. Harris, something to the effect of what he

9  said he -- Did you hear the detective inform other detectives

10 that he had thrown something over the fence?

11 A    Yes.  They said it -- he said it over the radio which was

12 -- you can hear audibly that "He just threw something over the

13 fence."  And that detective relayed it to other detectives on

14 that air channel.

15 Q    Did detectives search for the item that was seen being

16 thrown over the fence?

17 A    They did.  One detective went around into the

18 neighborhood.  Several other detectives were trying to get over

19 the fence.  The detective who saw the item being thrown,

20 Detective -- excuse me -- directed the other detective where he

21 saw the item being thrown, said it was thrown in this area.  At

22 that point the detective checked the area and right there in

23 the middle of the open was a firearm.

24 Q    Was that firearm collected?

25 A    Yes, it was.

1  Q    Did you personally do any investigation into this

2  particular firearm?

3  A    I did.  I went down and personally saw it at the APD crime

4  lab.  It was a Taurus model G2C, and that's a nine millimeter

5  simi-automatic firearm.

6  Q    Do you know whether or not that firearm was manufactured

7  in New Mexico?

8  A    It was not manufactured in the state of New Mexico.  I did

9  research and I also consulted a interstate Nexus trained

10 full-time ATF agent and it was not manufactured here.

11 Q    Okay.  Do you know whether or not this particular firearm

12 operated as it was intended?

13 A    I believe it did.  I conducted a function of the firearm

14 and after I did so I believe it functioned as designed.

15 Q    It appeared to have worked properly?

16 A    It did.

17 Q    Okay.  Now, you said earlier that the -- there were two

18 women that were observed to get out of the car at the hotel.

19 A    Correct.

20 Q    And I'm talking about the car that APD -- that came back

21 stolen.

22 A    Correct.

23 Q    Okay.  Was -- did you ever have an opportunity to speak

24 with one of those women?

25 A    I did.

1    Q     And was that reference another pending investigation?

2           **THE DEFENDANT:**  Objection.  What does that have to do

3    what's going on right now?  That has nothing to do what's going

4    on right now.

5           **THE COURT:**  Mr. Harris --

6           **THE DEFENDANT:**  That has nothing to do what's going

7    on right now.

8           **THE COURT:**  Mr. Harris, you need to control yourself.

9    You don't get to make objections.  You have an attorney who

10   will object --

11          **THE DEFENDANT:**  You're right.

12          **THE COURT:**  -- on your behalf.

13          **THE DEFENDANT:**  You're right, I'm sorry.  You're

14   right, I'm sorry, I apologize.

15          **THE COURT:**  Just -- I just want to remind you that in

16   addition to not having outbursts in court because it's not

17   allowed --

18          **THE DEFENDANT:**  I didn't know I couldn't object.

19          **THE COURT:**  Hold on.

20          **THE DEFENDANT:**  I didn't know I couldn't object, I'm

21   sorry.

22          **THE COURT:**  Hold on.  In addition to not having

23   outbursts and speaking out of turn, it's also really important

24   that you remember your right to remain silent and that anything

25   you say could be used against you.

1          **THE DEFENDANT:**  I understand that.

2          **THE COURT:**  So I would suggest that you not make

3    statements about your case or about witnesses in open court but

4    rather make statements through your attorney.  If we --

5          So here's what I would suggest you do.  Hear the

6    (glitch in audio) testimony.  If your attorney has an objection

7    to testimony, he can make it; otherwise, what we'll do is when

8    it's his turn to cross-examine, before he does so, if you want

9    to consult with him and talk to him about the testimony, I'll

10   give you a chance to do that.  But don't -- don't shout out in

11   the middle of the witness' testimony, okay?

12         **THE DEFENDANT:**  I'm sorry, I understand.

13         **THE COURT:**  Okay.

14         **MR. MKHITARIAN:**  So I apologize I didn't go over that

15   with Mr. Harris, Your Honor, but I will object.  I was waiting

16   to see where the line of questioning went on the grounds of

17   relevance, Your Honor.  I don't think another investigation is

18   relevant to a probable cause determination today for this

19   particular charge, Your Honor.

20         **THE COURT:**  Well we haven't heard where this

21   testimony is going but I'll just note that we're also set for a

22   detention hearing.  And to the extent that the government's

23   eliciting information on the question of detention rather than

24   probable cause, just make it clear, Ms. Simms, in your response

25   to the objection.  And frankly, to save time, I'm going to

1    allow that type of testimony.

2         But let me hear from the government in response to

3    the defense objection on the basis of relevance.

4         **MS. SIMMS:**  Well, the particular evidence that I was

5    going to elicit is that this witness was there that night and

6    made statements about what she saw that night.  I will be

7    talking about another investigation relevant to his detention

8    but this particular question was meant to elicit what that

9    witness saw.

10        **THE COURT:**  Okay.  All right.  The objection is

11   overruled.

12        And again, Mr. Mkhitarian, I am going to allow

13   testimony on the question of detention just to expedite things.

14   And you will have a full opportunity to cross examine.

15        **MR. MKHITARIAN:**  Thank you, Your Honor.

16        **THE COURT:**  Okay.  Go ahead.

17   **BY MS. SIMMS:**

18   Q    So Detective, did you speak with one of the women that

19   were there with Mr. Harris that night?

20   A    Yes, I did.

21   Q    Did she confirm to you that he threw a gun over the fence

22   when he ran from police on March 26, 2020?

23   A    She spoke of the event and said that during the event

24   Mr. Harris ran within a stolen vehicle, ran from police.  She

25   did not specifically see him throw the firearm.  She said that

1   she knew that he was armed at the time he ran from the police.

2   The view of the chase -- she was taken into custody before

3   Mr. Harris and the chase was out of her view but she did

4   confirm that he was armed that night.

5   Q    Okay.  And when police found him after he laid down on the

6   ground, did he have a firearm on his person?

7   A    He did not.

8   Q    Now, do you know whether or not Mr. Harris is a convicted

9   felon?

10  A    I do and he is.

11  Q    Are those felony convictions out of the state of Virginia?

12  A    They are.

13  Q    Is one of them a conviction for attempted breaking and

14  entering which in Virginia is a Class 5 felony punishable by up

15  to five years in prison?

16  A    Yes, that's one of them.

17  Q    Do you know that on that particular case he was sentenced

18  to five years; however, he -- five years with three years,

19  three months suspended, leaving a one-year and three-month

20  custodial sentence for Mr. Harris to serve?

21  A    That's correct.

22  Q    And you know that because you received his judgment and

23  sentence from Virginia; is that right?

24  A    I did from two different courts.

25  Q    Okay.  And the one that I just asked about is that from

1   Hampton, Virginia?

2   A     It was.

3   Q     And where was the other one from?

4   A     That's out of the (glitch in audio) New Circuit Court

5   (glitch in audio) Virginia.

6   Q     And after reviewing that JNS, you know that Mr. Harris was

7   convicted in 2013 of attempted grand larceny; is that correct?

8   A     Yes, that's correct.

9   Q     And on that he was sentenced to 10 years, two of which --

10  or eight of which were suspended leaving a two-year prison

11  sentence; is that right?

12  A     Also correct.

13  Q     And also at that time he was convicted of statutory

14  burglary; is that right?

15  A     Yes.

16  Q     And for the statutory burglary he was sentenced -- he was

17  given a 20-year sentence; however, 17 years were suspended

18  leaving a three-year prison sentence; is that right?

19  A     Correct.

20  Q     Did he -- did Mr. Harris in any way acknowledge to police

21  that he was a convicted felon back on that date of incident in

22  March 2020?

23  A     He did.  He told that to a detective after being read

24  *Miranda* and then providing a statement, a brief statement.

25  Q     Were you aware when detectives on that date of incident,

1  when they looked for what they sought -- the object that they

2  viewed Mr. Harris to throw over the fence, did they see

3  anything else in that area that could have been thrown or

4  didn't belong there?

5  A    They did not.  I actually spoke specifically to the

6  detective who found the gun and said it was right there out of

7  place in the middle of sort of like a residential area and it

8  was very obvious.  As soon as he pulled up he could see it.

9  And there was nothing else that he could see that was the size

10 of the object that was thrown that he thought it could be,

11 besides a firearm, at least.

12        **THE DEFENDANT:**  (indisc.)

13 Q    And did this occur in Bernalillo County, New Mexico?

14 A    It did.

15 Q    Okay.

16        **MS. SIMMS:**  Judge, if you don't mind, just to give

17 everyone notice, I'm going to start asking questions relevant

18 to the defendant's detention.

19        **THE COURT:**  Okay.  Let me just ask.

20        Mr. Mkhitarian, she is making a clear break between

21 the two.  Do you want to cross examine on probable cause first

22 and then we'll move into the detention part of it, or are you

23 okay with hearing all the testimony and then cross examining?

24        **MR. MKHITARIAN:**  I can but I'll defer to the Court on

25 how you want me to proceed.  I'm prepared to cross examine if

1    the Court would rather I wrap up that portion of the testimony.

2            **THE COURT:**  I mean, I'd prefer to just do it all now,

3    have the direct of everything and then you can cross examine on

4    everything.  And before we do that I'll give you a chance to

5    talk to your client.

6            **MR. MKHITARIAN:**  Yes, Your Honor, that will work, we

7    can do it that way.

8            **THE COURT:**  Okay.  As long as you're comfortable with

9    that.

10           Okay, Ms. Simms, go ahead.

11   **BY MS. SIMMS:**

12   Q    Had Mr. Harris come onto your radar in any other matter

13   over the last month or two?

14   A    He did.  I investigated an arrest of Mr. Harris on

15   December 29th of 2020.

16   Q    And generally, what was the purpose for you to make that

17   arrest?

18   A    Generally it was related to domestic violence and human

19   trafficking.

20   Q    Okay.  Now the victim, the alleged victim of domestic

21   violence in that case, was that the same woman that you had

22   talked to who was there the night of March 26, 2020?

23   A    That's correct.

24   Q    Okay.  And is she currently 18 years old?

25   A    She is.

1   Q    Is she the mother of Mr. Harris' child?

2   A    She is.

3   Q    And do you have an approximate timeline of that woman's

4   age when she became pregnant with Mr. Harris' child?

5   A    Yes, she was approx -- well she was 17 year old --

6   17 years old at that time.

7   Q    When she became pregnant with Mr. Harris' child?

8   A    Correct.

9   Q    Did she disclose to you that Mr. Harris had forced her to

10  engage in prostitution activities prior to her becoming

11  pregnant?

12  A    Yes, she did.

13  Q    Did she disclose that he had taken her to other states to

14  perform prostitution activities?

15  A    Yes, she did.

16  Q    Are you aware of any other victim, underage victim who has

17  also come forward prior to this regarding Mr. Harris making her

18  engage in commercial sex acts?

19  A    I am.  Some underage and some over 18 but many.

20  Q    Okay.  And isn't it true that -- well let me tell you.

21       Do you know whether or not Mr. Harris was in state

22  custody before he was brought into federal custody?

23  A    He was.

24  Q    And was a state judge determined that he would be held --

25  in the case that you're talking about in December, did a state

1    judge determine that he would be held on that case pending

2    trial?

3    A    Yes, they held him for trial.

4              **THE DEFENDANT:**  'Cause you lied.

5              **THE COURT:**  Mr. Harris, I remind you; don't talk.

6              **THE DEFENDANT:**  He lied.

7              **THE COURT:**  Go ahead.

8    **BY MS. SIMMS:**

9    Q    And then just to make the record clear for the Court,

10   prior to Mr. Harris' preliminary hearing in that case --

11   because they don't do grand juries anymore -- the United States

12   attorneys or you filed a complaint in this case; is that right?

13   A    That's correct.

14   Q    Okay.  But there was a detention hearing in that matter,

15   right?

16   A    There was.  I participated in it -- participated in it.

17             **THE DEFENDANT:**  Yeah, you did.

18   Q    And can you clarify how many -- it was one criminal matter

19   but how many police reports were involved in that state matter?

20   A    Not including mine, there was three separate felony

21   domestic violence cases that were charged against Mr. Harris so

22   a total of over four different criminal incidents that involved

23   felonies that Mr. Harris was charged with.

24   Q    Did any of those incidents involve weapons?

25   A    Yes.

1    Q    What kind of weapons?

2    A    There was an allegation of a firearm and also an

3    allegation of a Molotov cocktail that was used in an attempt to

4    burn down a facility.

5    Q    Was that facility a hotel?

6    A    Yes.

7    Q    Do you know the alleged domestic violence victim in that

8    case that you spoke with, do you know if she had had a

9    restraining order against Mr. Harris during that timeframe?

10   A    She got a temporary restraining order against Mr. Harris

11   and some of the incidents occurred during the time of that

12   restraining order, not all of them.

13   Q    Okay.  Did those incidents include threats against that

14   woman's life or the lives of her family members?

15   A    Yes, they did.

16   Q    And those threats were made by Mr. Harris allegedly?

17   A    Yes, allegedly.

18   Q    Okay.  Have you in your investigation in the last month or

19   so had an opportunity to view a Facebook page that you believe

20   belongs to Mr. Harris?

21   A    Not specifically the page but I did review some postings,

22   yes.

23   Q    Some postings, okay.

24        Did you see any evidence involving firearms from what

25   you viewed?

1  A    There -- I have not specifically viewed that particular

2  post, no.  I am aware of one but I have not viewed it myself.

3  Q    Okay.  Are you aware of one that may have been viewed by a

4  Homeland Security Investigations agent?

5  A    I am.

6  Q    Okay.  Did you view any posts where Mr. Harris appeared to

7  have admitted engaging in violence?

8  A    I viewed posts.  I also saw surveillance video and

9  Mr. Harris admitted to it.

10  Q    Okay, let's talk about the posts.

11        What posts did you see?

12  A    The date of the initial investigation, there was a post on

13  Mr. Harris' Facebook page which we later confirmed was his, in

14  which he says -- and I can read it for you if you want me to

15  but he specifically mentions that he just beat his baby momma's

16  ass.

17  Q    Why -- did he say in the post why he beat his baby mamma's

18  ass?

19  A    He did.  He said because she wouldn't -- I forgot what the

20  word was --

21              THE DEFENDANT:  Yeah, lie.

22              THE COURT:  Mr. Harris, please -- please stop with

23  the outbursts.

24              THE DEFENDANT:  He lying.  You right.  You know what?

25  I'm sorry.  You know what?  I won't say nothing else.  You know

1    what?  You right.  I apologize.  You know what?  It just -- he

2    -- they sitting here and they assassinating my character and

3    they lying but you know?  You right.  I mean, it's hard for me

4    because you're not -- I mean, you don't understand but I

5    totally understand.  I'm sorry, Your Honor.  I won't say

6    nothing else.

7              **THE COURT:**  Okay, all right.

8              **THE DEFENDANT:**  (indisc.).

9              **THE COURT:**  This is for -- this is not only to avoid

10   disruptions in court but this is also in your interest that you

11   not speak.

12             Okay.  go ahead, Mr. Ramos, finish your answer.

13             **THE WITNESS:**  Can you repeat the question?

14   **BY MS. SIMMS:**

15   Q    Yes.

16             Was there anything in the posts that indicated that

17   he beat his baby's mother because she refused to engage in

18   prostitution?

19   A    That was exactly the post, not in those words but that was

20   the meaning of the post, correct.

21   Q    Okay.

22             **MS. SIMMS:**  Judge, I think that's all I have from

23   this witness on detention.  I have other arguments from the

24   presentence -- you know, the pretrial report regarding

25   detention but that's all I have for this witness.

1          **THE COURT:** Okay. We'll take up arguments down the

2    road.

3          Mr. Mkhitarian, I'm going to give you an opportunity

4    to speak to Mr. Harris who really wants to talk to you before

5    your cross examination. So I'm going to put you-all in a

6    breakout room and then you can just come back when you're

7    ready. But we are running late on the docket so let's not make

8    this more than five minutes. Okay?

9          **MR. MKHITARIAN:** Yes, Your Honor. How do I get out

10   of the breakout room when we're done? Do I just message

11   somebody?

12         **MR. SPEAKER:** You can leave the breakout room or you

13   can ask me for assistance and I can --

14         **MR. MKHITARIAN:** Okay, thank you.

15         **THE COURT:** All right. And we'll just go off the

16   record until they come back in.

17      **(Off the record; On the record)**

18         **THE CLERK:** Okay, Judge, I think they're ready.

19      **(Pause)**

20         **THE COURT:** All right. Are you ready to proceed with

21   your cross examination?

22         **MR. MKHITARIAN:** Yes, Your Honor, thank you.

23         **THE COURT:** Okay. Go ahead.

24   //

25   //

1                    **CROSS EXAMINATION**

2   **BY MR. MKHITARIAN:**

3   Q    And is it Detective Ramos?

4   A    Yeah, that's fine.

5   Q    Okay.  Detective Ramos, so just to be clear, you weren't

6   personally there at the scene; you're reading from reports,

7   correct?

8   A    Related to the auto theft investigation?

9   Q    Yes.

10  A    Correct.

11  Q    Okay.  So you didn't personally see any of this?

12  A    I watched lapel video; I look at the complaint; I look at

13  police reports.  That's the extent of what I have seen.

14  Q    Okay.  So we'll talk about that.

15       In the lapel video, you can't actually see a firearm

16  thrown from Mr. Harris' hand; is that correct?

17  A    That's correct.

18  Q    And then did you have an opportunity to investigate this

19  case afterward?  I heard you testify that you saw the firearm

20  personally.

21  A    Yes, I have.

22  Q    Okay.  Were any fingerprints lifted from the firearm?

23  A    It was processed for DNA and fingerprints and that is in

24  the midst of getting evaluated and tested.

25  Q    Okay.  You don't have any of the results for the Court's

1  consideration today, right?

2  A    Do not.

3  Q    Do you even know if you lifted a DNA sample that was able

4  to be tested, or are you still waiting to see even if you have

5  any DNA?

6  A    The supplemental report by the crime scene specialist

7  specifically mentions a fingerprint.  It does not specifically

8  mention DNA but they never do.

9  Q    Okay.  So but you don't have a hit, per se, on the

10 fingerprint yet for the Court's review?

11 A    That's correct.

12 Q    Okay.  How long do those typically take?

13 A    I depends upon the caseload.  They can take sometimes

14 months, sometimes a year; it just depends on the caseload of

15 the particular lab that they're at.

16 Q    What color was the firearm?

17 A    The color of the firearm was black.

18 Q    Now, back to the actual incident itself, Mr. Harris was

19 seen leaving the motel by himself, correct?  He wasn't with

20 anyone leaving.  So he goes into the house with somebody but

21 leaves by himself.  Did I hear that correctly?

22 A    A house or motel?

23 Q    The motel.

24 A    Can you rephrase the question?  I'm a little confused.

25 Q    Let me get some context.

1          So he's seen pulling up to the motel; he exits the

2    vehicle with a female, correct?

3    A    Two females, yes.

4    Q    Two females.

5          They go into the motel room, correct?

6    A    They went into the lobby.

7    Q    Lobby.

8          And then Mr. Harris is seen exiting at that point by

9    himself when officers tried to approach him?

10   A    It doesn't specifically say by himself.  I can tell you on

11   label videos when they first contact him, there are two females

12   that they detain and they are outside of the motel under the

13   potel (phonetic).

14   Q    Okay.  So at this point your testimony was that Mr. Harris

15   leaves.  However, you can't see the actual firearm either in

16   his hand or on the video, correct?

17   A    I did not see that; that's correct.

18   Q    And the girl who testified -- or didn't testify but the

19   girl who made a statement that he had a firearm, she was

20   nowhere near Mr. Harris at the time that this firearm was

21   allegedly thrown, right?

22   A    Yes.  I think I made that clear.  She didn't see the

23   chase.

24   Q    Okay.  Now, the girl that had given a statement, has she

25   changed her statement at all throughout your investigation?

1  A    As related to the auto theft investigation --

2  Q    Yes.

3  A    -- or the other investigation?

4  Q    Both, since we're doing both the detention and the auto

5  theft and the preliminary.

6  A    As far as statements, she has never changed it to me.

7  There's been some other issues that have been brought up but as

8  far as me, as far as I go, she's been consistent this entire

9  time.

10  Q    Can you elaborate on the other issues brought up that you

11  just --

12  A    Sure.  During the execution of a search warrant on a

13  vehicle Mr. Harris was found down, there were some letters

14  found in the glovebox in which this alleged victim, allegedly

15  recanted her statement and also gave full custody of Mr. -- of

16  their child to Mr. Harris.

17  Q    So what story was she recanting exactly?

18  A    She was recanting a domestic violence story that she

19  reported to Albuquerque police.  It wasn't my specific incident

20  but it was one of incidents he was charged with.  But I think

21  it should be said that she has denied that she wrote those and

22  she denied that she signed those.

23  Q    Has she recanted or changed any other stories to your

24  knowledge?

25  A    Not that I'm aware of.  She's been very consistent as far

1  as I go.

2  Q    Okay.  Let's see here.

3         Now, the Facebook posts that you were talking about,

4  was that like an actual post?  I know it's kind of confusing.

5  Or was it one of those story things?  Was it a text or was it

6  like a video?  Could you explain what the post was?

7  A    I've never had any sort of social media so I don't know.

8  I can just tell you it was a picture of -- it said Facebook and

9  then it said it's Facebook handled.  I don't know specifically

10 what that means as far as Facebook goes.

11 Q    So it wasn't a video of him saying I beat somebody up.  It

12 was like (glitch in audio).

13 A    It was text, correct.

14 Q    Do you know if anybody else has access to that Facebook

15 account other than Mr. Harris?  Did you confirm that?

16 A    We're in the process of getting those warrants -- getting

17 that phone processed.  The only one that's told me that someone

18 else has access is Mr. Harris.

19 Q    So it could be possible someone else made that post?

20 A    According to Mr. Harris, yes.  I have not run across any

21 information that would lead me to believe that it wasn't him.

22 Q    Now, all these other cases that you were investigating

23 regarding human trafficking that -- regarding detention, those

24 have all been dismissed, correct?

25 A    Dismissed in the state court and we're working them on the

1  federal side right now.

2  Q    But in the state court's side they've been dismissed.

3  A    They have.

4  Q    So the conditions of release, the holding him in those

5  cases are no longer in effect, correct?

6  A    On the state side that's correct, yes.

7         **MR. MKHITARIAN:**  I have no further questions, Your

8  Honor.

9         **THE COURT:**  Any redirect?

10         **MS. SIMMS:**  Yes.

11                  **REDIRECT EXAMINATION**

12  **BY MS. SIMMS:**

13  Q    As far as you know, the dismissal of the state court

14  cases, that was not due to a lack of evidence, correct?

15  A    It was not at all to do with that.

16  Q    Now, you testified that somebody at some point found like

17  some type of letter supposedly written by Mr. Harris' baby's

18  mother recanting some of the domestic violence allegations that

19  occurred in December of 2020; is that right?

20  A    Yes.  I found them.

21  Q    Okay.  Can you describe more precisely what exactly you

22  found?

23  A    In the glovebox there was three what appeared to be sort

24  of Word documents that were -- had typed, a typed format.  The

25  dates were wrong but there was a bunch of misspellings and then

1   there was a notary stamp at the bottom.  And I believe there

2   was three or four pages.

3   Q    What do you mean when you say "the dates were wrong"?

4   A    There was -- it was -- there was the reference to

5   dismissing the charges which she filed in January of 2021 but

6   by the time I found it, it had not been January of 2021 yet or

7   that specific date.  I have a copy of it and I can get into

8   specifics but there was like a date in the future that she said

9   an incident didn't happen but it obviously couldn't have

10  happened because it was in the future.

11          And then I spoke to the alleged victim and she

12  strongly denied that she wrote, signed, or participated in

13  those.

14  Q    Did these documents appear to be suspicious to you?

15          **THE DEFENDANT:**  Everything suspicious to him, he the

16  police.

17  A    I wasn't there when the documents were made, obviously.

18  The fact that it was typed was suspicious to me; the fact that

19  it was found in the glovebox and not given.  Because he had

20  already been charged with several crimes related to this and

21  that document never came up.  And then the biggest reason I

22  have to believe it wasn't real because I asked the alleged

23  victim herself and she was very adamant that she would never

24  give up her child -- which is what one of the documents said,

25  that she was going to give up her child to Mr. Harris.  She

1  said she never signed that, she (glitch in audio).

2          **THE COURT:**  Agent just got disconnected.

3          **THE DEFENDANT:**  (indisc.)

4      **(Pause)**

5          **THE COURT:**  Mr. Harris wants to speak to

6  Mr. Mkhitarian.  Can you put them in a breakout room while

7  we're waiting for the agent to come back on please.

8      **(Pause)**

9          Let's go off the record for a minute.

10     **(Witness returned before going off the record)**

11         **THE WITNESS:**  Okay, I'm ready.

12         **THE COURT:**  Okay.  You were in the middle of

13 answering a question when you got cutoff or you were in the

14 middle of testifying about the alleged recanting; and

15 specifically I think what the alleged victim had said about she

16 wouldn't have signed that because she would never have given up

17 custody of her child.  I don't know if you recall where you

18 were but that's what I recall.

19         **THE WITNESS:**  That's correct.  That's basically where

20 I was going to finish was that she said she would never give up

21 custody of her child and that was one document.  There was two

22 different documents, one that recanted one of the domestic

23 violence incidents and then one that gave full custody of their

24 child to Mr. Harris.

25 **BY MS. SIMMS:**

1  Q    Now, and they were all typewritten; is that right?

2  A    With the exception of the signatures, yes, everything was

3  typed.

4  Q    Okay -- and okay.

5          **MS. SIMMS:**  You know what, Your Honor, I don't have

6  any further questions.

7          **THE COURT:**  Okay.  Is there any reason that Detective

8  Ramos can't be excused?

9          **MR. MKHITARIAN:**  I just have one question, one

10 question for Mr. Ramos on just something that was brought up

11 regarding the document that Mr. Harris was being asked.

12         **THE COURT:**  Okay, go ahead.

13                         **RECROSS EXAMINATION**

14 **BY MR. MKHITARIAN:**

15 Q    Detective Ramos, those typed documents, were they

16 notarized?

17 A    They were.

18         **MR. MKHITARIAN:**  No further questions, Your Honor.

19         **THE COURT:**  All right.  Can Detective Ramos be

20 excused?

21         **MS. SIMMS:**  Yes, Your Honor.

22         **THE COURT:**  Mr. Mkhitarian?

23         **MR. MKHITARIAN:**  Yes, Your Honor.

24         **THE COURT:**  Okay.  All right.  Detective Ramos,

25 you're excused.

1     **(Witness excused)**

2          **THE WITNESS:**  Thank you.

3          **THE COURT:**  Although you're certainly allowed to

4     remain in court proceedings if you wish.

5          Okay.  Any other witnesses?

6          **MS. SIMMS:**  No, Your Honor.

7          **THE COURT:**  Any witnesses, Mr. Mkhitarian?

8          **MR. MKHITARIAN:**  No, Your Honor.

9          **THE COURT:**  All right.  Any argument that either side

10    wants to make for the record?  I'm prepared to make a finding

11    of probable cause based on the testimony.

12          **MS. SIMMS:**  Not for probable cause.

13          **THE COURT:**  Mr. Mkhitarian, on probable cause?

14          **MR. MKHITARIAN:**  On Mr. Harris' behalf, Your Honor,

15    he wishes to argue to the Court, no fingerprints of his were

16    found on the firearm, no DNA has been presented to the Court

17    for his consideration, no video of him throwing a firearm has

18    been presented, nor is there any video based on the officer's

19    testimony.  So he would argue that there is no probable cause

20    linking the firearm to himself.

21          **THE COURT:**  All right.  Probable cause is not beyond

22    a reasonable doubt and based on the testimony that I've heard

23    in court today under oath, I find that there is in fact

24    probable cause to support the charge against Mr. Harris.  This

25    matter will continue.

1          And now we will move into the detention portion of

2    this hearing.

3          Any -- it sounds like the government only has

4    argument at this point, no other witnesses.

5          Mr. Mkhitarian, do you have any witnesses?

6          **MR. MKHITARIAN:**  No, Your Honor.

7          **THE COURT:**  Okay.  All right.  So let me hear from

8    the government on its request that Mr. Harris remain in

9    custody.  And I'll just note for the record that I have

10   reviewed the Pretrial Services Report, including Mr. Harris'

11   criminal history.

12          Go ahead.

13          **MS. SIMMS:**  Yeah.  I'm not going to rehash the

14   Presentence Report, crime for -- you know, arrests, per arrest

15   dating back to 2005 because the Court has had it.  But there're

16   -- for the record there are multiple warrants issued in these

17   cases.  There are at least two occasions where the defendant

18   FTA'd and then the case gets dismissed while he's in bench

19   warrant status which is bazar.  So, you know, he is -- I hate

20   to say this but he's a poster child for just -- I mean, it's

21   amazing to look at this criminal history and to think that he's

22   only got these three felony convictions, not even in New Mexico

23   and Virginia but he never -- you know, everything is warrant

24   this, warrant that.

25          I mean, and then around Christmas of this year, he

1   picks up three different domestic violence cases, one or two of

2   them using a Molotov cocktail is insane, you know.  And he's a

3   danger to the community; he won't show up; he travels all

4   around the United States; he's got priors out of Virginia; he's

5   got history in Georgia.  It's -- I'm at a loss for how he's

6   still out walking around.  If you let him out, he's gonna flee

7   and he's gonna go find this girl and he's gonna beat her and

8   that's what's gonna happen.  So I think it speaks for itself.

9           I think that we know -- the Court heard that he is

10  suspected to have been trafficking at least two underage women

11  and that will bear out here.  But Judge, he is -- he is

12  absolutely a danger and a flight risk and the United States

13  asks that he be detained.

14          **THE DEFENDANT:**  (indisc.) hey, I'm done.  I done.

15          **THE COURT:**  Mr. Harris, are you deciding to leave the

16  hearing because we will continue without you.

17          **THE DEFENDANT:**  I'm done (glitch in audio) (indisc.).

18          **MS. SPEAKER:**  Sorry, Your Honor, I think --apologize

19  (indisc.).  I do apologize for him just walking out.

20          Do you want him to come back in here?

21          **THE COURT:**  I'm not going to force him back in.  Why

22  don't you just let him know that the hearing will continue.  He

23  has the right to be present for the entirety of the hearing but

24  he has -- he's got up and walked out.  Give him an opportunity

25  to come back in; don't force him, and report back to me what he

1  says.  But let him know that if he chooses not to be present

2  for the hearing, I am still going to complete this hearing and

3  I'm going to make findings one way or the other and so we're

4  not recessing this hearing.

5          **MS. SPEAKER:**  Okay, one moment.  Let me go ahead.

6      **(Pause)**

7          **THE COURT:**  All right.  Mr. Harris, I suggest that

8  you not walk out because if you do, I will take that as you

9  voluntarily choosing not to be present for the remainder of

10  these proceedings that you have the right to be present for.

11  I'm not going to recess the hearing.  We will complete this

12  hearing today whether or not you choose to remain in the room.

13  I would suggest --

14          **THE DEFENDANT:**  I understand.

15          **THE COURT:**  I suggest you remain in the room.

16          **THE DEFENDANT:**  I understand.  I mean it's just --

17  it's hard for to hear somebody talk about me the way they talk

18  about me and I only got three -- like you said, I got three

19  convictions and --

20          **THE COURT:**  Okay.  Don't make any statement, sir.  Do

21  not make statements against your interests.  Anything you say,

22  including the statement you just made, could be used against

23  you so I suggest that you do not make statements.

24          Okay.  I think the government's presentation ended so

25  let me hear from Mr. Mkhitarian.

1          **MR. MKHITARIAN:**  Your Honor, I'd ask that Mr. Harris

2     be released.  Based on the testimony, Your Honor, Ms. Simms is

3     correct; he has three convictions.  He has appeared at his

4     court proceedings and resolved all those matters which is why

5     most of them, if not all of those warrants, were eventually

6     dismissed.  I would argue that --

7          **THE COURT:**  It's showing that he still has two active

8     warrants.

9          **MR. MKHITARIAN:**  Regarding the other cases out of

10    Virginia, Your Honor.  But Mr. Harris had asked that he be

11    released to the halfway house in lieu of custody.

12          **THE COURT:**  Okay.  All right.  Mr. Harris, I've

13    considered the factors under 18, United States Code, Section

14    3142(g) and the information presented at the detention hearing,

15    and I conclude that you must be detained pending trial because

16    the government has proven by clear and convincing evidence that

17    you're a danger to the community and by a preponderance of the

18    evidence that you're a flight risk and that no condition or

19    combination of conditions of release will reasonably assure

20    your appearance as required and the safety of the community.

21          The weight of the evidence in this case against you

22    is strong, despite the lack of testing evidence at this point.

23    You are subject to a lengthy period of incarceration if

24    convicted.

25          I base my findings on your prior criminal history

1    that contains a history of participating in criminal activity

2    while on probation, a history of violence or use of weapons, a

3    history of alcohol or substance abuse reflected in your

4    criminal history; you have a history of prior failures to

5    appear in court, prior attempts to evade law enforcement, prior

6    violations of probation.  You also have a warrant out of El

7    Paso County Court at Law Number 2 from Texas.  You also have a

8    probation violation warrant out of Newport News Circuit Court

9    in Virginia, and you're alleged to have committed this and a

10   number of other crimes while on probation out of Virginia.

11           For all these reasons, sir, you're going to be

12   detained pending trial in this case.

13           Is there anything further we need to take up?

14           **MS. SIMMS:**  No, Your Honor.

15           **MR. MKHITARIAN:**  No, Your Honor.

16           **THE COURT:**  All right.  Mr. Harris, you have the

17   right to appeal the Court's detention ruling.

18           We're in recess on this matter.  You're remanded to

19   the custody of the marshal service.

20       **(Defendant remanded)**

21       **(Proceeding adjourned at 12:05 p.m.)**

22

23

24

25

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>March 5, 2021</u>

           Signed                                               Dated

*TONI HUDSON, TRANSCRIBER*