```
                IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW MEXICO (ALBUQUERQUE)

UNITED STATES OF AMERICA,    .  Case No.: 1:21-CR-00303-MV-1
                             .
          Plaintiff,         .
                             .
     vs.                     .
                             .
RYAN HARRIS,                 .
                             .
          Defendant.         .  Tuesday, February 18, 2025
. . . . . . . . . . . . . . .   9:52 A.M.


   TRANSCRIPT OF PRELIMINARY REVOCATION AND DETENTION HEARING
        BEFORE THE HONORABLE JENNIFER M. ROZZONI
             UNITED STATES MAGISTRATE COURT JUDGE
```

APPEARANCES:

For the Government:    United States Attorney's Office
                       BY: LETITIA SIMMS, ESQUIRE
                       201 Third Street NW
                       Albuquerque, New Mexico 87102
                       (505) 346-7274
                       letitia.simms@usdoj.gov

For the Defendant:     Law Office of Wayne Baker
                       BY: WAYNE BAKER, ESQUIRE
                       14112 Piedras Road, NE
                       Albuquerque, New Mexico 87123
                       (505) 652-4222
                       federallitigator@gmail.com

For Pretrial Services: Keary Fenstermacher

Deputy Clerk:          C. Lopez
                       Pete V. Domenici U.S. Courthouse
                       333 Lomas Boulevard NW
                       Albuquerque, New Mexico 87102

Transcription Service: Liberty Transcripts
                       9107 Topridge Drive
                       Austin, Texas 78750
                       (847) 848-4907
                       DBPATEL1180@GMAIL.COM


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

```
                        INDEX
                                            Page

Case called                                 3
Arguments on Probable Cause
 By: Ms. Simms                              48
 By: Mr. Baker                              49
Court's Ruling on Probable Cause            53

Arguments on Government's Motion To Detain
 By: Ms. Simms                              56
 By: Mr. Fenstermacher                      59
 By: Mr. Baker                              62
Court's Ruling on Government's Motion To Detain   65

End of Proceedings                          66
Certification of Transcriber                67


WITNESSES FOR THE GOVERNMENT:

KEARY FENSTERMACHER
  Direct Examination by Ms. Simms           4
  Cross-Examination by Mr. Baker            16
  Redirect Examination by Ms. Simms         41

WITNESSES FOR THE DEFENDANT:

(None)




                             Identified   Received

EXHIBITS FOR THE GOVERNMENT:

(None)


EXHIBITS FOR THE DEFENDANT:

(None)
```

ALBUQUERQUE, NEW MEXICO, TUESDAY, FEBRUARY 18, 2025,

9:52 A.M.

MS. SIMMS:  Good morning, Your Honor.

Letitia Simms on behalf of the United States.

THE COURT:  Good morning, Ms. Simms.

MR. BAKER:  Good morning, Your Honor.

Wayne Baker on behalf of Mr. Harris who's present in custody.

THE COURT:  All right.  Good morning, Mr. Baker.

And good morning, Mr. Harris.

THE DEFENDANT:  How are doing today, ma'am?

THE COURT:  I'm all right.  How are you?

THE DEFENDANT:  I'm doing great.

THE COURT:  Good.

THE DEFENDANT:  That's just because I got my great lawyer with me.

THE COURT:  you do have a good lawyer.

All right.  Mr. Harris, you are here for your show cause hearing as well as detention hearing on petition for revocation and supervised release.

As I'm sure you already know, at that show cause hearing, the Government would have to present evidence to establish that there's probable cause to believe that you violated your conditions of release as alleged in the petition for revocation.

1          Mr. Baker, how does Mr. Harris want to proceed on

2  this?

3          MR. BAKER:  He'd like to proceed with a hearing,

4  Your Honor.

5          THE COURT:  All right.  Ms. Simms, are you prepared

6  with a witness?

7          MS. SIMMS:  Yes, Your Honor.

8          THE COURT:  Okay.  Well, Mr. Baker, Mr. Harris, why

9  don't you sit down, and Ms. Simms will get her witness up on

10  the stand.

11          MS. SIMMS:  The United States calls Probation

12  Officer Keary Fenstermacher.

13      KEARY FENSTERMACHER, GOVERNMENT'S WITNESS, SWORN

14          THE CLERK:  Go ahead and have a seat.  If you could

15  state and spell your last name for the record, please.

16          THE WITNESS:  Keary Fenstermacher.  Last name is

17  spelled F-E-N-S-T-E-R-M-A-C-H-E-R.

18                    DIRECT EXAMINATION

19  BY MS. SIMMS:

20  Q    And, sir, where do you work?

21  A    U.S. Probation Office in District of New Mexico here in

22  Albuquerque location.

23  Q    How long have you worked as a probation officer?

24  A    Since 2009 with the federal courts, and then about four

25  or five years with state probation and parole before that.

1    Q    Okay.  And in your capacity with U.S. Probation

2   currently, is it part of your duties to supervise Ryan

3   Harris?

4    A    Yes.

5    Q    Is Ryan Harris in the courtroom today?

6    A    Yes.

7    Q    Can you please identify him and describe what he's

8   wearing for the record?

9    A    He's in the -- at the table right in front of me wearing

10  an orange-and-white-striped top, balding head with a beard.

11          MS. SIMMS:  Will the record reflect the

12  identification, Judge?

13          THE COURT:  Yes.  The record will so reflect.

14  BY MS. SIMMS:

15   Q    When did you -- what are you supervising Ryan Harris

16  for?

17   A    He's got a 2021 case for felon-in-possession of a

18  firearm.

19   Q    And when was he released from custody on that case?

20   A    Federal custody, I believe he was released on -- if I

21  can check my notes here.  Would you mind if I give you exact

22  date?

23          THE COURT:  Mr. Baker --

24          MS. SIMMS:  (Indiscernible).

25          THE COURT:  Yeah.  Mr. Baker, do you have any

1  objection?  Mr. Baker, do you have any objection to Officer

2  Fenstermacher refreshing with his report as to when Mr.

3  Harris was released?

4          MR. BAKER:  No objection.

5          THE COURT:  Okay.  Go ahead.

6          THE WITNESS:  He was released from federal custody

7  on August 20th, and he was transferred to state custody in El

8  Paso thereafter for a detainer.  That detained was cleared as

9  noted in the violation report on or about October 18th when

10 he was extradited to Virginia Beach, which is when he was

11 released from state custody out there.

12 BY MS. SIMMS:

13 Q    Okay.  So when Mr. Harris was released from federal

14 custody, correct me if I'm wrong, it sounds like he had two

15 separate detainers from two separate states?

16 A    Correct.

17 Q    Okay.  The first one he went to El Paso, Texas, and that

18 was cleared?

19 A    Yes.

20 Q    And then they sent him still in custody to Virginia.

21 A    Correct.

22 Q    Is that correct?

23 A    Correct.

24 Q    And the state court in Virginia released him.  Is that

25 correct?

1  A    Yes.

2  Q    And then they sent him still in custody to Virginia.

3  A    Correct.

4  Q    Is that correct?

5  A    Correct.

6  Q    And the state court in Virginia released him.  Is that

7  correct?

8  A    Yes.

9  Q    Okay.  And that occurred on or about October 18th of

10  2024?

11  A    Yes.

12  Q    Okay.  At the time of his release, did he have

13  conditions of supervision from this Court?

14  A    Yes, he did.

15  Q    Was one of those conditions to refrain from any unlawful

16  use of a controlled substance?

17  A    Yes.

18  Q    Okay.  Now, he's released from custody in Virginia.

19  What was the situation with his release and him needing to

20  check in with you in this Court in Albuquerque?

21  A    So when he was released in Virginia, he had a probation

22  violation from out there which he was set up for the final

23  hearing.  So in between him getting released from custody, he

24  had the court date.

25       So he was kind of just staying wherever he could.  He

1  claimed several times he didn't really have a place to stay.

2  He would stay with some family, some friends.  Sometimes his

3  relatives might get him a hotel.  It was unclear as to

4  whether he was supposed to be checking in with Pretrial from

5  that release.

6  Q     Do you mean Pretrial in Virginia?

7  A     Right.

8  Q     Okay.

9  A     So while he was released on bond and pending that final

10 revocation hearing, it did not appear to me that he was

11 reporting to a probation officer, but it was slightly

12 unclear.  My understanding was that he -- he did not report

13 to a state probation officer for that pending hearing.

14 Q     Okay.  So just to make sure we have the timeline

15 straight, he gets released from Virginia state court on

16 October 18th, 2024.

17       At some point, he picks up a violation in Virginia, and

18 then he is then set for a hearing on that violation in

19 Virginia that's supposed to occur November 26th of 2024?

20 A     No.

21       So he -- he was released by the Hampton, Virginia for a

22 preexisting probation violation.

23 Q     Okay.

24 A     And that was shortly after October 18th.  It was like

25 within a few days.  I believe it may have been October 23rd,

1  which is the date I have federal supervision commencing on.

2      So when Hampton had released him pending that probation

3  violation, he had a court date set up for, like, November

4  26th.  So Probation was tentatively waiting for him to make

5  his appearance for that court date so we can close that out,

6  figure out what he needed to do, and we can get him back to

7  Albuquerque, New Mexico, or Las Cruces, New Mexico, because

8  he does have family.  His mom, I believe, is in Las Cruces.

9  Q    Okay.  So on November 18th of '24 -- of 2024, what

10  happened on that day?

11  A    I had communicated with Mr. Harris and instructed him to

12  report to our federal probation office out there, so that way

13  he could come in and meet with the probation office.  We

14  could get a face-to-face with him, get a drug test, have him

15  review his conditions of supervised release, potentially get

16  an address where he would be staying, that way we could have

17  our Virginia office possibly do, like, a courtesy

18  supervision.

19      He was instructed to report earlier in the day.  That

20  kind of just pushed on.  He got lost.  He got stuck in

21  traffic.  He ended up reporting at 4:50, which was right

22  before the office closed, which didn't give the officer a

23  whole lot of time, but they were able to meet with him,

24  collect the UA.

25  Q    Okay.

1   A     But he did report.

2   Q     And you said something like you had instructed him to

3   report to the U.S. Probation Office in the Eastern District

4   of Virginia.  Do you recall whether you asked him to report

5   on November 18th or whether you told him to report prior to

6   November 18th, if you recall?

7   A     Are you asking when I instructed him to report?

8   Q     Yes.  When did you instruct him to report?

9   A     If I recall correctly, November 18th was like the

10  beginning of the week, and I had instructed him during the

11  weekdays the previous week.

12  Q     Okay.

13  A     So it would have been a Thursday or Friday.

14  Q     Okay.  And prior to November 18th, 2024, would the

15  Defendant have been instructed to not use illegal substances?

16  A     I cannot say that I reviewed his judgment over the phone

17  with him in which I specifically instructed him.

18        I do know when he was released pending his probation

19  violation.  That was a condition of supervision.  When he

20  went for sentencing on this case, normally conditions I

21  reviewed, I would have to look, but I don't know definitively

22  right now.

23        Before somebody is released from custody, the case

24  managers do look over their conditions.  But I can't say I

25  specifically told him.

Fenstermacher - Direct

1   Q    Okay.  All right.  So a probation officer in the Eastern

2   District of Virginia did have him do a urinalysis on November

3   18th of 2024.  Is that right?

4   A    Correct.

5   Q    And what were the results of that urinalysis?

6   A    The preliminary results were positive for cocaine and

7   THC.

8   Q    Okay.  In your training and experience, do you have an

9   opinion about whether or not you would typically see cocaine

10  still in somebody's urine after, like, a month's time?

11  A    Cocaine?

12  Q    Yes.

13  A    The metabolite has a pretty short half-life and normally

14  would dissipate within three to four days.

15  Q    Okay.  So on November 26th of 2024, was Mr. Harris

16  scheduled for a hearing in his state of Virginia case?

17  A    Yes.

18  Q    Did he appear at that hearing?

19  A    No, he did not.

20  Q    Did he have contact with any law enforcement on November

21  26th of 2024?

22  A    Yes.

23  Q    Will you tell the Court about that?

24  A    So I had received a call on that same date from a law

25  enforcement officer indicating that he had detained

1  Mr. Harris.  There was an incident reported in by a random

2  caller.  Actually, not a random caller.  It was a bus stop --

3  a bus driver who called in that there was a female asking for

4  help, claiming that she was being abducted.

5      Law enforcement responded to that call and located

6  Mr. Harris and another female.  There were questions about

7  what was going on, what led to the incident, the fight, the

8  dispute.

9  Q    Did law enforcement make any observations about whether

10  or not Mr. Harris appeared to be under the influence of

11  anything?

12  A    They saw that he was unsteady in his gait and that he

13  had also admitted to ingesting alcohol.  More specifically,

14  he had drank two beers.

15  Q    And did the reporting officer, is that Officer Siegel

16  (phonetic)?

17  A    Yes.

18  Q    Did that officer also report that he had an odor of

19  alcohol coming from his breath?

20  A    If I review my violation report, I believe that is

21  something that he included on his police report.

22  Q    And when you wrote the violation report, is that

23  something that you would have put in there if you would have

24  seen?

25  A    Yes.

1  Q    All right.  And the Defendant admitted to having two

2  beers and he was not able to drive?

3  A    Correct.

4  Q    Okay.  Was the Defendant arrested at that time?

5  A    Yes, he was.

6  Q    Was it a condition of his supervision that if he is

7  arrested or questioned by a law enforcement officer, he must

8  notify the probation officer within 72 hours?

9  A    Yes.

10 Q    Is that a condition that he was advised of on November

11 18th of 2024?

12 A    Correct.

13 Q    Did he notify a probation officer within 72 hours?

14 A    No, he did not.

15 Q    Do you know how Probation found out about this arrest if

16 he didn't report it?

17 A    Officer Siegel had called Probation.

18 Q    Did they call Probation in Virginia or did they call

19 you?

20 A    They called me.

21 Q    And Mr. Harris did not follow up with you later within

22 72 hours and report this incident?

23 A    No, not until I kind of brought it up to him.

24 Q    When did you bring it up to him?

25 A    It was the 26th.  I would guesstimate it was right after

1  that 72-hour mark.

2  Q    Okay.  Did he make any admissions to you regarding that

3  incident?

4  A    Initially, no, he did not.

5  Q    Did he initially deny being arrested to you?

6  A    He did.   And then when I told him about information

7  probation had received, he minimized it as being something

8  that he needed -- he felt he needed to report.

9       I told him I felt it was pretty reasonable that he was

10  detained and put in cuffs by the officer, that it was pretty

11  reasonable for him to believe that he had been arrested and

12  that there was law enforcement contact.

13  Q    Did he eventually admit to you that he was arrested, but

14  he denied being under the influence of alcohol?

15  A    Correct.

16  Q    Did you ever ask him about his positive drug test from

17  November 18th?

18  A    I did.

19  Q    Did he admit to smoking marijuana?

20  A    Yes, he admitted to smoking marijuana.

21  Q    Did he admit to using cocaine?

22  A    He did not admit to anything other than the marijuana

23  use.

24       MS. SIMMS:  Your Honor, with permission from the

25  Court, is it okay if I ask some questions that would go to

 1  detention?  I don't think we've got that far yet, but --

 2          THE COURT:  We have not.  But since we have Officer

 3  Fenstermacher on the stand, I'm fine with that.

 4          Mr. Baker, you can also cross-examine him on that,

 5  as well.  Did you hear what she wanted?

 6          MR. BAKER:  Yes, I think we should have a

 7  determination on a preliminary hearing --

 8          THE COURT:  Well, I'm just trying to save time, but

 9  you can cross on whatever Ms. Simms gets into.

10          MR. BAKER:  All right.

11  BY MS. SIMMS:

12  Q    Did the Defendant have a stable residence when he was in

13  Virginia in October, November, December of 2024?

14  A    No, he did not.

15  Q    Did he report to you that he had been staying at a

16  different motel each night?

17  A    Basically, yes.

18  Q    Did you ever make any requests for receipts for these

19  motels or attempt to verify that he was staying at motels?

20  A    Yes.

21  Q    Did Mr. Harris ever provide you with any receipts for

22  the motels?

23  A    He did not.

24      (Whereupon, there was a brief pause in the proceedings.)

25          MS. SIMMS:  And, Your Honor, I'll pass the witness.

1    THE COURT:  Mr. Baker?

2                    CROSS-EXAMINATION

3  BY MR. BAKER:

4  Q    Good morning.

5  A    Good morning.

6  Q    So Mr. Harris is in serving supervised release in New

7  Mexico, correct?  Those conditions are in New Mexico?

8  A    Jurisdiction is out of the District of New Mexico.

9  Q    Okay.  And normally when someone starts supervision and

10 you're the assigned probation officer, do you meet with that

11 person?

12 A    Yes.

13 Q    Okay.  And when you meet with them, you have a

14 conversation about what the expectations are for him.  Is

15 that correct?

16 A    Correct.

17 Q    Expectations with respect to obtaining employment.

18 Isn't that right?

19 A    Correct.

20 Q    Also with respect to where he's going to live, correct?

21 A    Yes.

22 Q    And you tell him a whole list of things that are

23 prohibited.  Is that correct?

24 A    Correct.

25 Q    And that list is very important because those are

1  actually what's going to determine whether or not he's

2  successful or that when he's trying to be reintegrated into

3  society on supervised release.  Is that correct?

4  A    Yes.

5  Q    And those conditions include things like not associating

6  with known felons.  Is that right?

7  A    Correct.

8  Q    And limitations on whether or not the individual can

9  leave the jurisdiction.  Is that correct?

10  A    Yes.

11  Q    Also has specific instructions about what happens if

12  they have any contact with law enforcement.  Is that correct?

13  A    Correct.  That would be included in the judgment, which

14  includes all of the conditions of supervised release.

15  Q    I'm not asking about the judgment, sir.  All right.  The

16  judgment happened back when he was sentenced.  Is that

17  correct?

18  A    Correct.

19  Q    Do you know the sentencing date?

20  A    Correct.

21  Q    Do you know his date of sentencing?

22  A    Offhand, I do not.

23  Q    You don't.  So we're talking about back when he was

24  sentenced, there was a judgment issued.  Do you know if the

25  court provides to a Defendant a judgment as a normal course

1  of business?

2  A    My understanding is that defense attorneys always

3  provide their clients with a copy.  In my experience, when I

4  --

5  Q    But the court doesn't, correct?

6  A    Correct.

7  Q    Probation doesn't?

8  A    Probation will upon their reporting to Probation.

9  Q    Upon reporting --

10  A    Correct.

11  Q    -- but I'm talking about you just indicated that he had

12  knowledge of these conditions because of the judgment.  That

13  was your assumption, right?  You don't know that for a fact

14  because you don't know if he got the judgment.  Is that

15  correct?

16  A    Correct.

17  Q    Okay.  So you assume that he knew about these conditions

18  because there was a judgment that was written, and now you're

19  assuming that his defense attorney provided it to him, right?

20  And now you're assuming also that he had the opportunity to

21  get it at whatever location he was at and to read it.  Those

22  are assumptions, correct?

23  A    Correct.

24  Q    Okay.  So with respect to you as his supervisor, you

25  didn't have those conversations with him.  Is that correct?

1   A      At all, ever?  Is that your question?

2   Q      Yes.  My question is -- well, let me ask you this.

3        How long does it typically take for you to sit down with

4   a first-time supervisee and discuss the conditions of

5   release, discuss what your expectations are, discuss what

6   would happen in the event that he has a problem?  I'm sure

7   you talk to them about substance abuse, correct?

8   A      Yes.

9   Q      And when you talk to them about substance abuse, you

10  mention that if they violate three times automatically,

11  right, they will be revoked.  Is that correct?

12  A      You asked multiple questions.

13  Q      Sure.  You're talking to a new supervisee --

14  A      Uh-huh.

15  Q      -- and you're telling him about the conditions that he's

16  under and you're telling him that, listen, you have to

17  communicate with me, right?

18       You're the link between him and society, essentially.

19  You're the person whose obligation and responsibility is to

20  make sure that this individual follows directions, right,

21  that if he has problems getting a place to live, let's say,

22  getting a job, maybe he needs counseling, all of those

23  potential benefits that he's entitled to so that he can get

24  reintegrated into society, those are things that you are

25  required or your responsibility is to try to help him with

1    those.  Isn't that right?

2    A    That is part of our job, yes.

3    Q    Right.  And you want to help him, right, because for

4    you, you want to see this person succeed.  You don't want to

5    see him come back here and be going to court all the time.

6    Isn't that correct?

7    A    Yes.

8    Q    Okay.  So towards that end, with respect to people that

9    have either had drug problems in the past or possibly have

10   drug problems, you indicate to them that, listen, if

11   something happens and you end up using drugs, you know, call

12   me, let me know, okay?  Right?  You tell them that?

13   A    Sure.

14   Q    All right.  And you tell them, listen, in the event --

15   and that's not going to -- you're not going to be revoked for

16   that, is it?  Correct?

17        You tell them, I'm not going to revoke you because

18   actually three times is when you're revoked and that's when

19   you're automatically becomes before the court.  Is that

20   correct?

21   A    No.

22   Q    No.  Well, it is three times.  Is that correct?

23   A    More than three times in a calendar year --

24   Q    More than three.

25   A    -- is supposed to be a statutory revocation.

1  Q    Okay.  But it's not --

2  A    However --

3  Q    So it's not always enforced?

4  A    It's still a violation of condition of supervision when

5  they test positive, whether it's one or five times.

6  Q    Correct.  But I'm asking you --

7  A    I think there's --

8  Q    -- so there's times even when it's four, then you don't

9  enforce it, depending upon the conditions with the

10  supervisee?

11  A    Generally that would be up to the Court.

12  Q    Okay.  So in his case, again, you didn't speak to him,

13  you didn't sit down with him, you never had a face-to-face,

14  you didn't go over the conditions, correct?

15  A    He went to the Virginia office when he officially

16  reviewed the judgment and signed for the judgment,

17  acknowledged his --

18  Q    You know that because how?  You have those papers?

19  A    Yes.  It's at the table over there.

20  Q    Okay.  You also have -- you said that he got there,

21  right, 4:50, was that it?

22  A    Yes.

23  Q    (Indiscernible) closes at 5:00?

24  A    Well, they close the front doors at 5:00.

25  Q    Yeah.  So do you think that within the five or ten

1   minutes that he actually spoke with this individual, that

2   would be sufficient time for that individual to reference all

3   of the conditions, explain to him what he has to do?  Is that

4   correct?

5   A    I didn't base it off of the time frame between 4:50 and

6   5:00.  I based the action of him reviewing and acknowledging

7   his conditions based on my correspondence with the officer

8   and the receipt of the paperwork that he had signed.

9   Q    The officer, the probation officer there?

10  A    Correct.

11  Q    And what is that probation officer's name?

12  A    If I may look at the violation report.

13  Q    Sure.

14  A    It's on the violation report.

15       (Witness reviews document.)

16       Officer Brett Riley from the Norfolk, Virginia office.

17  Q    Okay.  So when was the first time that you spoke with

18  him?

19  A    Mr. Harris?

20  Q    Mr. Harris.

21  A    I don't recall the specific date, but it would have been

22  October -- I don't know, October 28th, somewhere around

23  there.

24  Q    Okay, October 28th when he was --

25  A    Late October.

1  Q     Late October?

2  A     Uh-huh.

3  Q     And when you spoke to him, you spoke to him only once or

4  you spoke to him numerous times?

5  A     Numerous times.

6  Q     Okay.  And did you communicate only by phone or did you

7  have text messages?

8  A     Primarily by phone.

9  Q     Primarily.  But if I said to you that Mr. Harris

10 indicated that he texted you on more than one occasion about

11 matters and that you responded by text, would that surprise

12 you?

13 A     No.

14 Q     Okay.  So during all this time, even when you were

15 texting him, you never sent him another copy or anything

16 about his specific conditions, right?  You never even told

17 him the conditions, correct?

18 A     I would have had a verbal conversation with him about

19 conditions of supervision.  However, that's nothing that's

20 official.  He didn't sign anything.

21 Q     Right.  And you --

22 A     So --

23 Q     -- testified earlier on direct, didn't you, that you did

24 not in fact have a conversation with him with respect to the

25 specific conditions that he's under?

1  A     I cannot recall a specific conversation in which I went

2  over each and every condition.

3  Q     Okay.  Now, with respect to the -- he was in custody up

4  until, you say, I think it was 10/28 was the date that he was

5  released by Virginia?  Isn't that correct?

6  A     I think it would have been around the 25th.

7  Q     Okay.  And when a person comes out of custody, they're

8  given a little bit of grace period, right, for their drug,

9  possible positive test, because if he was in fact using in

10  prison, that's not necessarily a violation of his terms of

11  supervision release because his supervised release hadn't

12  started.  Is that correct?

13  A     I think that's debatable.

14  Q     It's debatable?

15  A     Yes.

16  Q     So In other words, the terms of supervision begin not on

17  the date that he begins his supervision but beforehand?

18  A     No.

19  Q     No.  So, well, let me ask you.  When you get a new

20  supervisee, they come in today to the office, right, and

21  they've been in custody the whole time, do you take a drug

22  test right away?

23  A     Generally, yes.

24  Q     And if that person, in fact, was positive for a drug,

25  and obviously it happened while he was incarcerated before

1   his supervision began, would you consider that a violation?

2   A    I think it's taken into context of how soon after the

3   individual was released from custody and when we're

4   collecting a test.  I think it's utilized more as a

5   supervision tool to see -- to get a baseline where we're at,

6   what we need to do, and also test an individual's willingness

7   to be truthful and honest with Probation.

8   Q    That's an important factor?

9   A    There's a lot of different things, I think, that are

10  kind of taken into consideration.

11       However, the UA was collected after their release from

12  custody, unless we were to have a hearing and call in the

13  laboratory scientist to testify as far as how far back the

14  drug use could have been.  I think it's kind of subjective,

15  but it's not something that we would --

16  Q    So when you're discussing these factors --

17  A    -- press to violate somebody.

18  Q    -- to the supervisee, if he acknowledges, yeah, I've

19  used, I used when I was in, you know, I smoked marijuana when

20  I was in, that's actually beneficial to you, right, because

21  you're getting a sense of where he's at, what his prior usage

22  was?  And you're also getting a sense of whether he's going

23  to be honest with you, correct?

24  A    Sure.

25  Q    Okay.  And it's a fact that Mr. Harris did, in fact, say

1  to you that, yeah, he did smoke marijuana when he was in.  Is

2  that correct?

3  A    Yes.

4  Q    Let's turn now to the issue of what happened in

5  Virginia.  Now, you said he was arrested on the 26th, I

6  believe, right, 11/26?

7  A    Correct.

8  Q    Okay.  And he was released on a bond from that vicinity,

9  right?  That state court system?

10      And isn't it a fact that he called you later that day on

11  the 26th to tell you that his -- because the 26th was

12  supposed to be the day that the final hearing on the

13  probation violation was scheduled, correct?  The same day

14  that he got arrested was the day that he was supposed to have

15  the violation hearing, right?

16  A    Uh-huh.

17  Q    Okay.  So he happened to call you that same day and

18  informed you that the violation hearing, the scheduled date

19  didn't happen.  Is that correct?

20  A    Correct.

21  Q    Okay.  So he called you that same day and told you that.

22  Correct?

23  A    Correct.

24  Q    All right.  And when he told you that, he admitted,

25  right, that the case wasn't going forward and that it was

1  going to have to be rescheduled.  Is that right?

2  A    My recollection is, I believe I got, like, a voicemail

3  that there was no court hearing.  I don't recall that there

4  was any, like, specific reasoning.  But when I did get in

5  contact with him thereafter, it kind of made sense why he

6  missed his court date.

7  Q    Okay.  But he told you about it, and he informed you on

8  that specific day, correct?

9  A    He did inform me.  I don't recall whether it was

10  specifically on that day, but I would say that it's safe to

11  assume he called on that day to let me know.

12  Q    So you're saying that it was a voicemail and it wasn't a

13  -- well, you don't know.  You're not sure whether it was a

14  voicemail or whether --

15  A    There was both.  There was both.  But initially I think

16  he left me a voicemail.

17  Q    Okay.  And then you called him right back, I gather?

18  A    Right.  And then I would have reached out.

19  Q    Okay.  So he was calling you on or about that day.

20  Correct?

21  A    Uh-huh.  Correct.

22  Q    And 72 hours hadn't lapsed, correct?

23  A    No, when I had talked to him, it was after the 72 hours.

24  Q    It was after 72.

25  A    Uh-huh.

1   Q    How could that be if he called you the same day, right,

2   left a voicemail and you said that you called him back that

3   same day.  How could that be 72 days after -- 72 hours after?

4        Let me ask you a question.  Do you have your phone with

5   you?

6   A    No, I do not.

7   Q    You don't have your phone on you.

8   A    No.

9   Q    It's not in your paperwork.  It's nowhere -- oh, it's

10  over there.  Okay.

11       Well, can you look at your phone, with the Court's

12  permission, and find out from looking at the past text

13  messages or specific calls and dates and time and see when,

14  in fact, Mr. Harris called you on the 26th or not and whether

15  or not you had a conversation with him on the 26th.  And if

16  not, what's the next nearest day?  Can you do that?

17  A    Sure.

18  Q    Please.

19       THE COURT:  Mr. Baker, I'm having trouble

20  following.  I understand that there's the contention about

21  the phone call, but if you could clean up what it was they

22  talked about, because it's not clear to me what was discussed

23  or if there was a discussion.  Because there's an arrest and

24  then there's a hearing that was supposed to have taken place,

25  and that has not been made clear at all in terms of --

 1       MR. BAKER:  Okay.

 2       THE COURT:  -- what happened there.

 3       MR. BAKER:  Okay.

 4       THE COURT:  Ms. Simms, you're welcome to clean that

 5  up, too.  However --

 6       MR. BAKER:  Thank you.

 7       (Whereupon, there was a brief pause in the proceedings.)

 8       THE COURT:  I'll just note for the record that

 9  Officer Fenstermacher checked his phone to refresh his

10  recollection about phone calls made with Mr. Harris on or

11  about November 26th, 2024.

12       You may proceed, Mr. Baker.

13       MR. BAKER:  Okay.  Thank you, Your Honor.

14  BY MR. BAKER:

15  Q    And did you check your phone?  Obviously, you did, sir?

16  A    Yes.

17  Q    Did you find any of those calls?

18  A    Not the call log.  That's too far back.

19       I did have a note in which I did have a conversation

20  with him about the incidents that occurred with Officer

21  Siegel, and that was on December 4th.

22  Q    Are you saying that between 11/26 and December 4th you

23  hadn't spoken to him at all?  You're not saying that, are

24  you?

25  A    Not directly.

1  Q    Directly.  In other words, you left him a message that

2  day, okay?  Your earlier testimony was that you called him

3  back that day.

4  A    I had called him back.

5  Q    Okay.  Right.  And you spoke to him?

6  A    There were multiple calls made --

7  Q    Multiple calls.

8  A    -- some of which were not answered.  His voicemail was

9  full.

10  Q    But are you sitting here today under oath and saying

11  that between 11/26 and December 4th, that under all those

12  calls, whether they were answered or not, voice messages,

13  that in no time did you have a conversation with him where

14  you spoke about the fact that he was arrested on the 26th?

15  A    That conversation took place on December 4th.

16  Q    So you acknowledge that you had calls with him, that

17  some were answered, some were conversations.  You became

18  aware of the 11/26 incident on that date, correct?

19  A    I recall him leaving a voicemail.

20  Q    Okay.

21  A    Yeah.

22  Q    And you recall being told by the probation officer who

23  called you and said, hey, this is what happened to your

24  supervisee, correct?  I mean, not the probation officer, I'm

25  sorry, the arresting officer.

1  A    Correct.

2  Q    All right.  So you were aware before, way before

3  December 4th, that he had been arrested?

4  A    Way before, yes.

5  Q    Okay.

6  A    I was -- I was aware before.

7       There was a sequence of events that occurred when

8  contact was initiated by the officer leaving a voicemail,

9  trying to reach out to the officer.  So between those

10 activities occurring and me actually finding out, it probably

11 took a few days for me to get the details.

12 Q    But, again, this is all somewhat a speculation at this

13 point because you don't have any written notes of what

14 unfolds between you and either the officer or the supervisee.

15 You don't have a log that shows the calls, correct?  Either

16 way, one way or the other, it goes too far back, right?  So

17 you can't --

18 A    My log is that on December 4th is when I had the

19 conversation with him and we addressed the law enforcement

20 contact because at that time is when I had the information

21 from the law enforcement agency.

22 Q    And let's go back just to clarify.

23      Do you know what time he was arrested in Virginia Beach,

24 or whichever time it was?  I'm sorry.

25 A    It was early in the morning, if I recall correctly.

1  Q    Right.  It was like, one in the morning on the 26th.

2  Would that sound correct?

3  A    Sure.

4  Q    Okay.

5  A    It's in the ballpark, but I mean --

6  Q    And by that time, had they done his blood alcohol

7  content when they arrested him for being intoxicated?

8  A    I believe that was one of Mr. Harriss complaints was

9  that they did not do a BAC.

10 Q    Oh, so they didn't do a BAC?

11 A    I don't know.

12 Q    To the best of your knowledge, there was no reports, no

13 conversations with the officer indicating that a blood

14 alcohol content was taken.  Is that correct?

15 A    Correct.

16 Q    So he was arrested based on observation, right, and a

17 conversation?  Is that correct?

18 A    Observation and conversation?  Sure.

19 Q    And he was released on his own recognizance, right, or

20 on minimal bond.  And he then was supposed to report to the

21 initial hearing for his probation violation that occurred

22 years ago, correct?  Not the initial, the actual hearing.

23     Back up.  He was brought to Virginia, extradited, right,

24 or taken by Virginia or the marshals to Virginia because it

25 was a pre-existing probation violation.  Correct?

1    A    Correct.

2    Q    And he went for the initial appearance and was given a

3    date of 11/26 for the hearing.  Is that consistent with your

4    understanding?

5    A    Yes.

6    Q    Okay.  And so on 11/26, he was in custody until 8:00 or

7    9:00 a.m. when he got released.  And the hearing was in a

8    different town from -- a different location from where the

9    town that he was arrested and the jail that he was in.  Is

10   that correct?

11   A    I'm not familiar with --

12   Q    Okay.

13   A    -- the geography of that location.

14   Q    Well, Newport News was the town that the probation

15   violation --

16            MR. BAKER:  New Hampton?

17            THE DEFENDANT:  Hampton.

18   BY MR. BAKER:

19   Q    I'm sorry, Hampton, Virginia was where the probation

20   violation was, correct?

21   A    Yes.

22   Q    Okay.  And do you know what jurisdiction this is that he

23   was arrested in?

24            THE DEFENDANT:  Virginia Beach.

25            MR. BAKER:  Excuse me?

1          THE DEFENDANT:  Virginia Beach.

2          MR. BAKER:  Virginia Beach, okay.

3    BY MR. BAKER:

4    Q    So two different locations.  So he knew that, having

5    spoken to you before, that you were concerned and you were

6    actually waiting for what would happen when his violation in

7    Virginia was resolved, right?

8          That was your main concern at that time.  If you're

9    going to be a supervisee of mine, right now you're in

10   Virginia, you're released on conditions.  And on the 26th,

11   you're going to get the final hearing, and I'm going to find

12   out if you're going to be incarcerated or you're free to now

13   return to New Mexico.  Correct?

14   A    Yes.

15   Q    Okay.  And have you had conversations with him about how

16   he was going to get back to New Mexico?

17   A    We did.

18   Q    Was there talk about him getting bus fare to come back?

19   A    Yes.

20   Q    All right.  So as soon as he gets released and then he

21   realizes he can't get to the court in time before the

22   hearing, he calls you that day on the 26th, leaves a message.

23   You call him back.  And over the next five or six days you

24   had conversations, but you don't have a specific recollection

25   of telling him about these conditions.  Right?

1   A       (No audible response).

2   Q       When you speak to him, did you know by then that he was

3   released before the December 4th conversation?  Released with

4   respect to the violation had been resolved?

5   A       Yes.

6   Q       So you know that the resolution of the violation was

7   that he was released?

8   A       Yes.

9   Q       Okay.  So at what point in time did you tell him he was

10  released, you can take a bus, we'll send you fare, or how are

11  you going to do that?

12  A       When did I have that conversation?

13  Q       Well, you said you had spoken to him about, okay, after

14  this is resolved, you're going to come back to New Mexico and

15  we're going to start your supervision in the location where

16  the jurisdiction that has your case.

17          So my question is, you had spoken to him about the

18  possibility of, you know, bus fare.  Now you speak to him on

19  December 4th.  Did you tell him bus fare is available or did

20  you speak to him about logistically how he's going to return?

21  A       I don't recall specifically a conversation about how he

22  was going to be returning on December 4th.  I do know we had

23  a conversation about when everything gets resolved out there,

24  how we were going to get him back to New Mexico.

25  Q       Okay.  And what was the answer to that?  How were you

1  going to get him back?  You're going to pay for bus fare?

2  A    There were multiple different options.

3      If he had family that could assist him with

4  transportation, that would be utilized first.  We also have

5  Second Chance Act funds sometimes for situations similar to

6  Mr. Harris' in which when there's funds available, when

7  Probation has exhausted all of their resources, we can

8  purchase a bus ticket.

9  Q    Now, you had conversations after December 4th with

10  Mr. Harris, correct?

11  A    Yes.

12  Q    Okay.  And in fact, in one of those conversations, he

13  told you that he had an interaction with a police officer.

14  Isn't that correct?

15  A    I don't recall if it was a police officer or a security

16  guard.

17  Q    But he informed you, right?

18  A    No, it was a police officer.

19  Q    Police officer.

20  A    That's correct, yes.

21  Q    That he had an interaction with a police officer

22  questioned, and he knew at that time after your conversation

23  on December 4th, and before, that one of his obligations was

24  to tell you any kind of contact with law enforcement,

25  correct?

1  A    Correct.

2  Q    Okay.  And on December 4th, when you spoke to him and

3  you told him, hey, wait a minute, you were arrested, why

4  didn't you call me -- even though you had spoken to him in

5  between, but you never mentioned that.  But he said to you,

6  why didn't you let me know?  And he indicated that he didn't

7  believe, he didn't think he had an obligation to report to

8  you, right?  He said to you, this was a violation, not a

9  crime.  Isn't that correct?

10 A    Can you ask one question at a time?

11 Q    All right.  When you confronted him with the fact that

12 he had been arrested on the 26th, isn't it true that he

13 indicated that he was not aware that he was responsible,

14 required to contact you for something that was, in his words,

15 just a violation, not a crime?

16 A    He gave me multiple explanations.

17 Q    And what I just said is correct, right, that this was a,

18 like a code violation?  It's a ticketed offense, typically?

19 A    Well, he didn't --

20 Q    It's not a crime.

21 A    -- he didn't agree with the arrest.  He did mention

22 something to the effect of what you're saying.

23 Q    Okay.

24 A    I don't remember the exact wording of it.  And he also

25 said that he wasn't going to tell me about it.

1  Q    He wasn't going to tell you about it?

2  A    Yeah.  He --

3  Q    Because he didn't know he had to, correct?

4  A    He didn't feel like he needed to talk to Probation about

5  it.  He wanted to go --

6  Q    Right.  But there's only one reason why -- you know, now

7  you're coming to a conclusion, right?  Why?  If he did not

8  understand that it was his obligation to tell you, then would

9  that be consistent with he had no reason to tell you,

10 correct?

11     The two go hand in hand.  If I have no obligation to

12 tell you, and when you speak to me and I said, there's no

13 reason for me to tell you because I had no obligation?

14         MS. SIMMS:  I'm going to object to the extent it

15 calls for speculation.

16         THE COURT:  At this point, I'll sustain that

17 objection.  Mr. Baker, I think you've made your point.

18         MR. BAKER:  Okay, Your Honor.

19         THE COURT:  Okay.

20         MR. BAKER:  Thank you.

21         THE COURT:  We can just move on.

22         MR. BAKER:  Okay.

23 BY MR. BAKER:

24 Q    Now, with respect to the issue of violation, it says in

25 your report that the cocaine, you were waiting for a drug lab

1  test.  Do you have those results?

2  A    The confirmation, I do not.

3  Q    You don't?

4  A    No, I do not.

5  Q    One way or the other?

6  A    Correct.

7  Q    Okay.  Now, with respect to his intentions in

8  Albuquerque, have you spoken to him about where he plans on

9  living, about what family members he has here, about job

10 opportunities?

11 A    Yes.

12 Q    And it's true that his sister lives here, correct?

13 A    I don't recall.  He did speak about his child being here

14 and wanting to be around where his child was living.

15 Q    Right.  When you spoke to him, were you informed of his

16 other family members that live here?

17 A    It sounded like he had family members that lived all

18 around the place.  I don't recall him saying he had a sister

19 here in Albuquerque.

20 Q    Well, that's his first violation, correct?

21 A    Yes.

22 Q    All right.  And you acknowledge that it was just the

23 drug violation, which could easily have occurred while he was

24 in custody before his conditions existed, that in fact he

25 wouldn't have been violated for that purpose?

1    A    I think your statement is inconsistent with what we

2    would normally see in a normal case.

3         Normally, when somebody starts supervised release,

4    they're released in our jurisdiction, most likely in our

5    courthouse and, therefore, we would do our initial testing

6    thereafter.

7    Q    Right.  And you would do the whole conversation.  You

8    would get to know the person.

9    A    Right.

10   Q    You would have a good sense of what his intentions were,

11   a good sense of what his goals are, a good sense of where he

12   could possibly get a job, a good sense of whether he had a

13   drug addiction, a good sense of whether he has family members

14   here, a good sense of whether or not those family members

15   were willing to put him up and let him stay there.  Right?

16   You would know all that?

17   A    In a normal case, yes.

18   Q    So isn't it fair to say that you could have that

19   conversation with him today and then make a determination as

20   to whether in fact it would be appropriate for him to live

21   with his sister as he now starts out on supervision under you

22   in this jurisdiction?

23   A    At some point that conversation would probably take

24   place.  My understanding is that he has a halfway house

25   condition for his conditions.

 1          MR. BAKER:  All right, Your Honor, that's the

 2   extent of my questioning of the witness.  Thank you.

 3          THE COURT:  I think that was a good extent, all

 4   right.

 5          Ms. Simms, any redirect?

 6                    REDIRECT EXAMINATION

 7   BY MS. SIMMS:

 8   Q    I'd just like to narrow down the timeline a little bit.

 9        You testified that Mr. Harris called you on 11/26/24 to

10   tell you -- and left you a message.  Is that correct?  A

11   voicemail?

12   A    It was either 11/26 or shortly thereafter.  So it was,

13   like, shortly after when that hearing should have taken

14   place.

15   Q    Okay.  And in the voicemail, he relayed information that

16   that hearing was continued, but you don't recall him giving

17   you a reason.  Is that correct?

18   A    Correct.

19   Q    You testified something to the effect of when you were

20   notified by the arresting officer, you had some thought like,

21   oh, that makes sense that the hearing was continued.

22   Correct?

23   A    No.

24   Q    Because I thought there was some discussion on one of

25   our examinations where you said something to the effect of,

1  oh, I guess that would make sense that it was continued if he

2  had been arrested that day.  Do you recall that?

3  A    I recall getting the information bits and pieces as to

4  the sequence of the events.  My recollection is getting a

5  voicemail from law enforcement.

6      We get emails that there's -- somebody ran an NCIC.

7  There's phone numbers of the reporting law enforcement agency

8  we normally try to reach out to, and it's call-in number,

9  leaving a voicemail.  This officer did call me back, and I

10 believe having the conversation with that police officer

11 about what had occurred, what he had observed, and I believe

12 we had a conversation that he had mentioned to the officer

13 that he had court.

14     And I don't think I knew at that time whether he had

15 missed, but it was kind of, well, he's in custody.  I don't

16 think I had information that he had been released in time for

17 court or not, but it was -- it was likely that he was going

18 to miss that court hearing.  And then I received, what I

19 recall, was a voicemail from him saying that it was

20 rescheduled.

21     And what I recall is thinking that -- you know,

22 questioning whether was it rescheduled, did he miss it, does

23 he have a warrant for missing the hearing?  So it was just

24 more work for Probation to do to try to figure out what

25 exactly happened.

1   Q    In the voicemail that Mr. Harris left you, notifying you

2   that the hearing was continued, he did not tell you because I

3   was arrested?

4   A    Correct.

5   Q    Okay.  And then you testified that it wasn't until

6   December 4th of 2024 that you had the conversation with

7   Mr. Harris wherein you addressed that arrest.  Is that

8   correct?

9   A    Correct.

10  Q    Is it your practice to not confront someone that you're

11  supervising until you have gathered all of the information

12  about an arrest like this?

13  A    I would not say it's my practice.  Every situation is

14  kind of unique.  And for this situation, this is kind of the

15  way it had worked out.

16       A lot of times we are not contacted by law enforcement,

17  so we don't have that information.  We may rely more heavily

18  on the person we supervise to give information to us that may

19  be would be leads for us to look elsewhere.  But I think --

20  Q    But you did -- I mean, between 11/26 and 12/4, did you

21  spend time trying to figure out the circumstances of this

22  arrest?

23  A    Absolutely, yes.

24  Q    And the information that you obtained during that time

25  period, did any of it come from Mr. Harris?

1   A    No.

2   Q    Okay.  This condition that he is supposed to, that

3   Mr. Harris is required to report any contact, questioning, or

4   arrest from law enforcement to you, was that gone over with

5   him on November 18th?

6   A    Yes.

7   Q    Okay.  And I just wanted to clarify, because Mr. Baker

8   asked when is the first time that you talked to Mr. Harris,

9   and you testified it would have been at the end of October.

10  Is that correct?

11  A    Correct.

12  Q    So when you're reaching out to Mr. Harris at the end of

13  October, despite that you being unable to sit down with him

14  and have him sign his conditions, what is the nature of that

15  conversation that you're having with him in late October?

16  A    Various things.

17       What he's doing out there, where he's living, what's the

18  time frame look like for him to remain out there before he

19  can return.  Is there a possibility that he may want to stay

20  there and we could ask for courtesy supervision in that

21  location?

22       There's a lot of different things that we kind of have

23  to iron out to figure out what direction is this going.

24  Q    Would use of controlled substances be something that you

25  talked about with him during that time?

1   A    Yeah.  I would, you know, ask about any kind of alcohol

2   use, drug use, any kind of association with negative peers,

3   anybody involved in law enforcement -- or illegal activities.

4   Q    In your communication with him, was it your

5   understanding that he knew he's not supposed to use illegal

6   narcotics or drink alcohol?

7   A    Yes.

8   Q    And although your violations focus on the cocaine and

9   the marijuana, is one of his conditions also that he's not

10   supposed to use alcohol?

11   A    Yes.

12   Q    Okay.  Have you -- you've been a probation officer for a

13   long time?  Have you ever seen cocaine still in someone's

14   system after a month?

15   A    No, I have not.

16   Q    Okay.  You testified that Mr. Harris admitted to you

17   that he had smoked marijuana.  Did he give you a time frame

18   for the marijuana smoking?

19   A    Yes.

20       He -- he had mentioned multiple experiences with

21   marijuana, with the most recent one, I believe, being four

22   days prior to our conversation.

23   Q    Four days prior to your conversation.

24   A    Uh-huh.

25   Q    When was your conversation?

1  A    (No audible response).

2  Q    Oh, do you recall writing that, "When asked about the

3  positive drug test from November 18th, he admitted to smoking

4  marijuana but denied any other illegal substances?"  Is that

5  the conversation that you're talking about?

6  A    I'm sorry, can you read that one more time?

7  Q    Okay.  When asked about the positive drug test from

8  November 18th, from this report, this sentence seems to be

9  written as though you are asking him about the drug test that

10 occurred before the conversation on November 18th, correct?

11 A    Yes.

12 Q    This would have been a question that was asked when you

13 already got the drug results, correct?

14 A    Correct.

15 Q    Okay.

16 A    I don't recall the specific date.  I would have to look

17 at my notes to see when that was.

18 Q    Okay.  But when you asked him about it, whenever that

19 was, which was after you got the drug results, he admitted to

20 you that he had smoked marijuana as recent as four days

21 before this conversation?

22 A    Correct.

23 Q    Okay.  You were asked several questions about

24 investigation or questions you've asked Mr. Harris about what

25 his situation would be like upon his return to Albuquerque,

1  New Mexico.  Do you recall that line of questioning?

2  A    Yes.

3  Q    Do you recall being asked about Mr. Harris saying

4  something to the effect of he has a child here who he would

5  like contact with?  Do you recall that?

6  A    That was one of his motivating factors for returning to

7  Albuquerque and wanting to live in Albuquerque.

8  Q    Are you aware that the child is shared with him and a

9  victim of domestic violence of his?

10  A    No.

11  Q    Are you aware of any of the circumstances with this

12  child's mother?

13  A    No.

14          MS. SIMMS:  Okay.  I believe I don't have any other

15  questions.

16          THE COURT:  All right.  Mr. Baker, Mr. Harris, come

17  on up.

18          MR. BAKER:  I wish to clarify one last point with

19  the -- if I may?

20          THE COURT:  No.

21          MR. BAKER:  Okay.  Thank you.

22          THE COURT:  No.

23          Ms. Simms, why don't you make your argument for

24  probable cause on each of the violations from there.

25          And then Mr. Baker, I'll hear from you.

1          MS. SIMMS:  As far as probable cause, it is a

2     condition that he not use illegal substances.  I recognize

3     that this case is a little procedurally different from what

4     we usually deal with.

5          Because of the fact that Mr. Harris had two

6     separate detainers in two separate cases that he had to deal

7     with, although I believe the testimony was that his

8     conditions were with his judgment, at the very least he was

9     advised somewhat informally in the conversations in late

10    October.  The formal sit-down where Probation goes over their

11    conditions was not done until November 18th.  However, upon

12    the questioning -- after the drug results came back, the

13    questioning after that occurred, he admitted to using

14    marijuana four days prior to that conversation.

15         So it looks like, and I'll ask the Court to take

16    judicial notice of the violation report, which states in the

17    second paragraph, "On December 4th, the Eastern District of

18    Virginia reported to their laboratory process the urine

19    sample collected on November 18th, which returned positive

20    for cocaine, metabolite, and cannabinoids."

21         So if the drug results didn't come back until

22    December 14th -- or December 4th, and Mr. Fenstermacher

23    presumably would have had this conversation with him either

24    on December 4th or after December 4th, if the Defendant

25    admits to using cannabis four days prior to December 4th,

1   that puts him November 30th or December 1st, which is still

2   after when he was advised that he's not allowed to use --

3          THE COURT:  Though that's not alleged in the

4   petition.

5          MS. SIMMS:  True.  But there is probable, you know,

6   there's -- that also supports his drug use just generally

7   while on conditions of release.

8          So we do think that Mr. Fenstermacher discussing

9   his drug use with him, although not the formal sit-down, put

10  him on notice of his conditions, which were his conditions,

11  that he not use narcotics.  And then the evidence is pretty

12  undisputed that he did not -- Mr. Harris did not tell him

13  about his arrest on November 26th, which was after the

14  November 18th advisement, formal advisement of his

15  conditions.

16         So I think there is probable cause for both of

17  these to go forward.

18         THE COURT:  He can step down.

19         THE WITNESS:  Thank you.

20         THE COURT:  Sorry about that.

21     (Whereupon, the witness was excused.)

22         THE COURT:  Mr. Baker.

23         MR. BAKER:  Thank you, Your Honor.

24         Your Honor, I appreciate Mr. Fenstermacher's

25  willingness to be candid and to acknowledge that his specific

recollection of these matters is somewhat vague.  And no

fault of his own.  I can understand, you know, it's a

situation where he's never met the individual, he's hearing

things over the phone, he speaks to the cop that made the

arrest, then he finds out that he missed the hearing, gets

the phone call.  He said they had conversations between then

and December 4th.  However, the issue of his arrest never

came up.

I believe he testified earlier that the police

officer who made the arrest contacted him also that day.  So

he was aware of the arrest.  Whether he needs all the

information or not, the fact that he was aware of an arrest

that had happened and the fact that he did speak to him

during that interim period before December 4th is, in my

mind, sufficient to show that there was a conversation, it

wasn't on December 4th.  That may have been a secondary

conversation.

But, again, let's look at the evidence.  Where is

the evidence?  We have no phone call log.  I understand that.

Your probation officer, he's supposed to maintain your calls,

maintain attend your phone.  I have calls, you know, from

people and texts from people that I've called three years

ago.  If I look on my phone.  I can just go through it and

find it.  So we don't have that.  We don't have any reports

or any notes that he has, other than he said he had a note on

1  December 4th on his phone that he spoke to him.  No

2  handwritten notes, no contemporaneous notes of phone calls,

3  no dates of phone calls and what the results of it were.

4        So I think it's fair to say that the evidence of an

5  individual who didn't have -- and let's look that he signed

6  those forms, the release condition, but he signed it in --

7  at, you know, 4:50 and went there to a place that closes at

8  5:00.  They had to do a drug test that day, so that takes 10

9  minutes or so, and then he signs the form.  And I would

10  suggest that there's no real belief that he was specifically

11  informed of each of those conditions.  Rather he said, here's

12  your conditions of release, let's go and sign it, okay,

13  here's the drug test, let's move forward.

14        So here's an individual that, and we showed that

15  once he did speak to him and was informed that he had an

16  obligation to tell, if he had any contact, that when he

17  called him, hey listen, you know, this cop and I had a

18  conversation, he was asking questions, and I'm just letting

19  you know because now I know that this is something that I'm

20  obligated to do.

21        So, it's to me, I believe that there's not

22  sufficient proof that, A, he was informed of the requirement

23  to tell him before the incident occurred; two, that -- and

24  again, he admitted he used marijuana.  I would suggest that

25  it's consistent with him using when he was still in custody,

1  and not that marijuana stays a long time, and we don't have

2  any proof of cocaine because there is no report that's in

3  fact confirming it.

4        So, it would be nice thing to say, well gee, if he

5  did speak to him and said that, maybe then he would have

6  violated these conditions and, in fact, if he did speak to

7  him, then we do have probable cause.  But I believe through

8  his testimony, we see that there was a lot of things going

9  on, there weren't specific calls.  All he's asking Mr. Harris

10  is, look, I know I have supervised release now, I know I'm

11  going to be supervising in Albuquerque.  I have a sister who

12  lives there who is willing to have me live with her.

13        What we're essentially asking is, let's start it

14  today and say, have an interview, see if -- put him on an

15  ankle monitor, he's got a job lined up.  Let him start his

16  supervision here and not be based on supervision where the --

17  I mean, as I'm aware, and I believe he testified, that

18  Virginia's federal probation did not take supervision over

19  him.  So their obligation was de minimis.  Their obligation

20  was just to handle it this one time.

21        It could have -- and that is a possibility and he

22  indicated that there's a possibility that we can just

23  transfer it for this time frame, but they didn't.  So there

24  was no requirement.  When he left that probation officer that

25  day, there was no requirement to call them back, there was no

1 requirement to let him know what happened with respect to

2 Virginia's probation. He had no obligation to call them, no

3 obligation to report to them, no obligation to look for work,

4 and he was left in the control of New Mexico's Probation.

5 So, again, when you look at it, it seems to me that

6 it's clear that in this case, there's a valid reason why he

7 did not make an acknowledgement because he did not know it

8 and that the drugs all occurred prior to the date that the

9 supervision began. So I believe that -- and just looking at

10 the equities, here's a person that is going to start

11 supervised release, we have a place for him to stay. We can,

12 you know, ask to adjourn this for a time frame, let him begin

13 his supervision, and three months down the road, he can

14 revisit it in front of Judge Vazquez if there's been

15 problems. But otherwise, I don't believe this rises to the

16 level sufficient to go forward with it.

17 Thank you, Your Honor.

18 THE COURT: Well, if that's something you want to

19 take up with Judge Vazquez, I don't have control over that

20 part. So you would have to take up with Judge Vazquez

21 whether or not she would want to see how he was doing.

22 So let me just start, my job here is, first of all,

23 just to find whether there's probable cause to believe that

24 Mr. Harris violated his conditions as set forth in the

25 petition. We have two conditions here. One was a mandatory

1 condition that he refrain from the unlawful use of controlled

2 substance, and a second standard condition that if he's

3 arrested or questioned by a law enforcement officer, which I

4 think is a pretty clear statement, that he notify his

5 probation officer within 72 hours.

6         The facts are, as testified to by Officer

7 Fenstermacher, are essentially that Mr. Harris was released

8 from custody here in Albuquerque, sent to El Paso, and then

9 ended up in Virginia based on charges in various areas, but

10 that he was released in Virginia in -- originally there was

11 an October 18th date, but I'll just say sometime late in

12 October of 2024.

13         At that point, Officer Fenstermacher did make

14 contact with Mr. Harris.  They had some brief conversations.

15 It's unclear whether or not he actually went through his

16 conditions of release, based on the testimony.  What is

17 clear, though, is that Mr. Harris did visit with a Virginia

18 probation officer on November 18th of 2024, late in the day,

19 4:50 p.m., I believe by all accounts.  At that meeting, he

20 was given his conditions of release, which he did sign, which

21 presumably means he read them, and a UA was collected that

22 day.

23         That said, it is unclear to me that he actually

24 understood what his conditions are.  While it's within reason

25 that he should not be using controlled substances, he had not

1  been given the instructions formally, and I don't really

2  believe that there's any evidence that he actually had that

3  specific condition told to him by Officer Fenstermacher.  No

4  fault on Officer Fenstermacher, it's just he's got a lot of

5  people to supervise him, and the conversations just were not

6  necessarily in his memory.

7          So that said, as to the mandatory condition that he

8  refrain from any unlawful use of controlled substance, it's

9  not clear to me that Mr. Harris was aware of that condition

10 prior to November 18th.  And I don't find that there's

11 probable cause to believe that violation occurred.

12         That said, you know, if there can be -- Ms. Simms

13 made an argument about a different date, potentially, based

14 on omissions that Mr. Harris made later.  And if the petition

15 that needs to be amended to take up that, then it certainly

16 can be amended in that way and, perhaps, there would be

17 probable cause in that regard.

18         As to the standard condition that he be arrested or

19 questioned by -- if he were arrested or questioned by a law

20 enforcement officer, it sounds like he may have misunderstood

21 that condition.  But regardless, at least between -- at least

22 by December 4th, there was a conversation with Mr. Harris and

23 Mr. Fenstermacher that there had been law enforcement

24 contact, and I think even Mr. Baker admitted that there was a

25 confusion about whether, because Mr. Harris believed that he

1  didn't commit a crime, that it was just a violation, that it

2  didn't need to be reported, which is actually consistent with

3  what is stated in the petition where he said that he did not

4  intend on reporting his arrest unless Probation became aware

5  of the incident.

6          So I don't think that there's really any dispute

7  that Mr. Harris did not -- he did not report his arrest

8  within the 72-hour period as required by the standard

9  condition in his supervision.  So I will find that there's

10  probable cause to believe he violated that condition.

11          With that, we're talking about detention.

12          Ms. Simms, I'll let you speak on that.

13          Mr. Fenstermacher, you can also give your position

14  on detention, as well.

15          And, Mr. Baker, I'll hear from you on detention, as

16  well.  I know you've already kind of made your argument about

17  where things should go from here.

18          But Ms. Simms.

19          MS. SIMMS:  Your Honor, the United States is moving

20  for detention.  I have -- I prosecuted Mr. Harris before.

21  Mr. Baker and I have spent a lot of time arguing about

22  Mr. Harris.

23          I can tell you, Your Honor, that his underlying

24  case came about because he had so many domestic violence

25  cases with his child's mother in the span of a few days that

1  APD literally found a felon-in-possession case that had been

2  neglected in state court and brought it for the purpose of

3  getting him off of the streets because it was such a volatile

4  situation with this woman.

5          Mr. Baker and I litigated her text messages and

6  every aspect of this at his felon-in-possession sentencing

7  with Judge Vazquez.  But the United States believes he made

8  fake affidavits that he kept around to present when he was

9  arrested for domestic violence.  We believe that he is

10  violent, and we presented evidence that he was involved in

11  the sex trafficking of minors at his sentencing.

12          THE DEFENDANT:  You're (indiscernible) because of

13  that, because I was (indiscernible) minor?

14          THE COURT:  Sir?  Mr. Baker -- or, excuse me -- Mr.

15  Baker, control your client or we're --

16          THE DEFENDANT:  Just so you know.

17          THE COURT:  Mr. Harris, Mr. Baker will have an

18  opportunity.

19          MS. SIMMS:  This is not the first outburst in

20  court.  I believe he had some with Judge Robbenhaar last

21  week.  He had some in the prior case with Judge Khalsa.  He

22  doesn't listen to authority figures.

23          He had -- of course, he had two other cases pending

24  with his FIP going.  That's what he was doing the last part

25  of the year.  Basically, as soon as he gets out, he has been

1  -- you know, and I bring up this other stuff because when --

2  that's the context when I am looking at this report that he

3  is in an argument with a woman who reports that he is trying

4  to abduct her and he is drunk, and there is clearly a

5  confrontation going on in the street.  I look at that in the

6  context of the other things that I know about him.

7          So to me, that indicates that he is still a danger

8  to the community to include younger women who are addicted to

9  drugs and have mental health struggles, which was the pattern

10 of conduct in the other case.  But it just -- it didn't even

11 take -- I mean, he couldn't even make it to the end of the

12 year before he is arrested again.  He doesn't have -- so

13 that's the danger stuff.

14         But as far as the compliance, he has fled from law

15 enforcement in his prior case.  His Pretrial Services Report

16 from that case indicates criminal history dating back to

17 2003.  It's just a long list of failures to report, probation

18 violations.  He has a number of domestic violence cases.

19 He's got an aggravated battery conviction in 2005.

20         Probation violation, you know, like, it's a

21 receiving transferring stolen vehicle from 2006, conditional

22 discharge.  Probation violation, probation revoked and

23 reinstated.  Probation violation, finally 182 days in jail.

24 And it just kind of goes on like this.  2008, possession of a

25 controlled substance.

He's got several dismissed cases in here. 2009, warrant issued for failing to appear in court. Another 2009, another battery against a household member where we go through the whole, you know, warrants are issued numerous times during the pendency of that case for his failure to appear.

He's just -- he's got stuff going on all across the country. He will not do what he is told to do by probation. He's just not going to do it. We're going to be back here -- we're going to be back here in a couple weeks on some other thing.

So I think he's a flight risk. I think due to his connections in other parts of the country, and I just don't think he's capable of -- there's no conditions that are going to make him do what he needs to do to stay out of trouble.

THE COURT: Thank you.

Officer Fenstermacher, your position on detention?

MR. FENSTERMACHER: Your Honor, Probation, initially was trying to be as lenient as we could, provided the circumstance that we were under, the circumstance that Mr. Harris was under.

It's not very common that we have (indiscernible) straight out of BOP (indiscernible) that are out of custody or who are out of state. So, for example, the unique challenge (indiscernible). When situations like that occur,

1  Probation's going to do our best to reach out and try to

2  solicit compliance, solicit an individual's willingness to

3  comply with what the Court's orders are.

4        It was kind of difficult to determine how willing

5  Mr. Harris was to comply with his orders.  On the surface, he

6  would call us.  (Indiscernible), you know.  He had some

7  challenges following on instructions (indiscernible).  I'll

8  instruct them, hey, you need to call next Monday at a certain

9  time.  So I would be expecting a call, that time would come

10  and I would wait until the end of the day.  Then he wouldn't

11  call, and so then the middle of the next day or so or I would

12  call him.

13        Although he would follow up with instructions with

14  me, he wasn't, at that time, avoiding me.  Avoiding my calls.

15  He would call me back.  But there was a limit to the level of

16  his cooperation.  He (indiscernible) in another state, and it

17  was very difficult for us to get eyes on him and didn't have

18  full supervision other than a telephone call.  That's not how

19  we do supervision.

20        So, the first, you know, the main thing was to get

21  him into an (indiscernible) office and have them get eyes on

22  him and see how he's (indiscernible).  Again, he was supposed

23  to report earlier in the day.  He was in Charlotte until

24  4:50.  He called me, I want to say it was about 3:30, said he

25  was in traffic, he was going to try to get across town.

1          So, again, this kind of demonstrates his

2   willingness to comply a little bit but it's going to be on my

3   terms.  And then, when there was -- I would say if it was

4   just the UA, we could address that, we could move forward.  We

5   can (indiscernible) no more drug use, you got the positive,

6   whether he admit it or not.  Our goal was still to get him

7   back to New Mexico.

8          And then when he started having law enforcement

9   contact, (indiscernible), the fact that he had law

10  enforcement contact and then he failed to report it to

11  Probation, the nature of the allegations, a little

12  questionable.  Again, there's nothing real concrete but it's

13  suspicion to actual concrete evidence.  So, it continued to

14  escalate.  Probation felt that it was appropriate to ask for

15  a warrant that point.

16         You know, we were really banking on that November

17  26th date for him to finalize the state probation and get him

18  back to New Mexico, and then at that point going to December

19  (indiscernible).  We needed to take some action.

20         We requested a warrant -- I'm just looking at my

21  note -- it looks like I had a conversation with him on or

22  about February 6th and instructed him to report to the

23  Probation Office.  He didn't report it, so I reached out.  It

24  wasn't just as simple as calling him and he would answer.  He

25  might -- I might call him and then he calls me and, you know,

1  it wasn't very quick.  But, I recall that there was a

2  conversation on or about December 10th and I asked him why he

3  didn't report Probation as I instructed and I asked him why

4  he didn't report.  And then we were talking about him getting

5  back to New Mexico.  You know, I informed him

6  (indiscernible).

7         I did not continue to call him thereafter.  I

8  believe my instructions were clear multiple times, initially

9  for him to report on December 6th and a second one on

10 December the 10th (indiscernible).

11        Between that time period, he did not get a job.

12 It's interesting that he ended up here in Albuquerque where

13 (indiscernible).  But my understanding is that

14 (indiscernible).

15        THE COURT:  He was arrested here?

16        MR. FENSTERMACHER:  Correct.  (Indiscernible).

17        THE COURT:  All right.  Mr. Baker.

18        And I'll just note, Mr. Baker, that you do have the

19 burden here, to show by clear and convincing evidence that

20 he's not a flight risk or a danger.

21        MR. BAKER:  I'm aware, Your Honor.

22        Your Honor, I'll just indicate that, you know,

23 we're not here to retry his life.  We're not here to pick and

24 choose areas of prior behavior that we believe supports our

25 position.  Obviously, Ms. Simms, if it were her choice, he

would go to jail for the rest of his life without a chance of
supervision.  And I understand that's her position.

Like we said, we had long hearings about matters in
his sentencing.  Most of the specific offense characteristics
that increased the guidelines were not found, many of them by
Judge Vazquez, coming to his ultimate sentence.  There was no
evidence, other than initial phone calls, that his baby mama
had any interest in anything other than meeting with him
because, yes, there were lots of text messages and some that
included, yeah, I called the cops on you because you didn't
want to meet with me the other day, let's meet up tonight.
And they did.

And then -- you know, so it's not like, a
cut-and-dry situation, where you have somebody, who -- and he
has a child with this woman.  They were talking about, shared
custody, they were talking about how they would go forward.
He still has obviously an interest in seeing his child.  And
he blared out something that, I can understand why he was
quite vexed about because having to -- you know, when you go
to the yard, when you go to the place he was at Jessup, and
it was an FCI Jessup.  And when they have to see your
paperwork, they see your PSR.  Either that, or you go to PC
and spend all your time in segregation by yourself.

So, when they saw that, it said that he was -- his
allegations against the baby momma that, again, there was no

1  -- there was nothing in evidence that supported it, other

2  than these initial reports.  So, none of these cases went

3  anywhere.  If he did, in fact, supposedly rape her when she

4  was 17, no case was ever brought, even though that was

5  brought to the law enforcement's attention at an early age.

6        So, it's not a question of whether or not people

7  have a bad opinion of him, or whether or not in the past he's

8  been alleged to have done lots of things, but he suffered

9  mightily for that, and he indicated what happened to him.

10  He's a big man, but, you know, you can't fight with everybody

11  you like.  So, yeah, he's annoyed that that was his PSR.  It

12  wasn't proved up.  We talked about taking it out.  I thought

13  it was supposed to be taken out.  It didn't.

14        So there's a lot of things here, that really

15  shouldn't be before the Court.  But, let it be said that, to

16  the extent we were talking about early violations, most of

17  them happened when he was 18 when Ms. Simms was recounting

18  his initial failures to appear.

19        Be that as it may, it was clear confusion between

20  him and Probation about what his expectations were, what he

21  was required to say, when, in fact, he did tell them about

22  the arrest.  And you made a ruling, but I would suggest that

23  with respect to detention, I think that if he has an

24  opportunity to sit down with Probation and let Probation do

25  their regular course of inquiry to see if in fact there is a

suitable location where he can stay, that he has -- he can be put on a GPS and live with his sister, and then allow the case to go forward until Judge Vazquez can see him, which oftentimes is not an immediate time because of her calendar. I know she has some trials coming up.

So, I would ask that he be placed -- I would ask that Probation do a full interview and allow a determination as to whether or not he can be placed at his sister's for the purpose of waiting until the hearing before Judge Vazquez.

Thank you, Your Honor.

THE COURT: All right. As we talked about and as, Mr. Baker, I know you know, the burden is high for you in these situations. So I'll tell you, we all have a history. It sounds like Mr. Harris, has quite a history, whether or not it was long ago or close in time. Right now, though, I'm looking at the fact that he was told in December that he had a warrant out and he hung up on his probation officer and had to be found here in Albuquerque.

So, on that fact alone -- I'm not talking about your history, Mr. Harris, I'm just talking on that fact alone, you had to be arrested after you had been told you had a warrant and you were in Albuquerque, not Virginia any longer. I don't think you've overcome the burden of showing by clear and convincing evidence that you're not a flight risk. You may --

1          THE DEFENDANT:  Can I ask a question?

2          THE COURT:  Mr. Harris, don't speak, okay?  Don't

3   speak.  It may be that you are also a danger to the

4   community.  I don't have any of that in front of me right

5   now.  I only have what Ms. Simms said and what

6   Mr. Fenstermacher said and then obviously what your attorney

7   said in response.

8          So, on the basis of you being a flight risk, I will

9   detain you pending further proceedings.  And I would --

10  Mr. Baker, you know, sometimes, Judge Vazquez can fit people

11  in in between.  So to the extent that you want to get

12  Mr. Harris before her quickly, I would suggest calling

13  chambers.

14         MR. BAKER:  Thank you, Your Honor.

15         THE DEFENDANT:  Thank you.

16         THE COURT:  This matter will be in recess.

17         MR. BAKER:  Thank you, Your Honor.

18      (Whereupon, at 11:27 a.m., the proceedings were

19  adjourned.)

20                        *  *  *  *  *

21

22

23

24

25

```
 1                C E R T I F I C A T I O N

 2          I, DIPTI PATEL, court-approved transcriber, certify

 3    that the foregoing is a correct transcript from the official

 4    electronic sound recording of the proceedings in the above-

 5    entitled matter, and to the best of my ability.

 6

 7

 8    _____

 9    DIPTI PATEL, AAERT CET-997

10    Expires: December 6, 2026

11    LIBERTY TRANSCRIPTS          DATE:  April 11, 2025

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```